## IN RE PETERS.

(No. 5,706.)

(Submitted March 21, 1925. Decided April 25, 1925.)

[235 Pac. 772.]

*Attorneys—Conviction of Felony or Misdemeanor in Federal or State Court—Moral Turpitude—Disbarment.*

Attorneys—Conviction of Felony or Misdemeanor in Federal or State Court—Disbarment.
1. Under subdivision 1 of section 8961, Revised Codes of 1921, whenever it is brought to its attention that an attorney of the bar of this state has been convicted of a felony or misdemeanor involving moral turpitude in a state or federal court, the supreme court will on its own motion and on the record of conviction alone strike his name from the roll of attorneys.

Same—Disbarment—Purpose of Proceeding.
2. The purpose of disbarment is not to inflict punishment but to purge the profession of one who lowers its high standards and brings it into disrepute and contempt, as well as to protect the public at large and the courts from acts of the unscrupulous.

Same—Disbarment on Record of Conviction—Question Before Supreme Court.
3. Since, generally, the record of conviction of an attorney itself shows whether the crime or misdemeanor of which he was convicted involved moral turpitude, the only question before the supreme court in a disbarment proceeding based upon subdivision 1 of section 8961 above is whether he was convicted, not whether he was actually guilty.

Same—Moral Turpitude—Definition.
4. Moral turpitude within the meaning of section 8961, Revised Codes, authorizing the disbarment of an attorney on conviction of a crime or misdemeanor involving moral turpitude, is everything done contrary to justice, honesty or good morals.

Same—Officer of Bank Making False Report to Comptroller of Currency—Offense *Held* to Involve Moral Turpitude.
5. Where an attorney who was also a director of a national bank actively connected with its management was convicted for making false reports of the bank's condition to the comptroller of the currency, *held,* after an examination of the evidence made because of his prior standing and the fact that he did not profit by the transaction, that the course pursued by the attorney was fraudulent and involved moral turpitude warranting his disbarment.

Attorney and Client, 6 **C. J.**, sec. 37, p. 581, n. 59, 60; sec. 42, p. 585, n. 2, 5; sec. 65, p. 603, n. 24; sec. 77, p. 608, n. 91.

1. Crimes and misconduct warranting disbarment of attorney, see note in 42 **Am. Rep.** 557. See, also, 2 **R. C. L.** 1100.

IN THE MATTER OF THE DISBARMENT of Julius Peters, a member of the bar of Montana. Respondent disbarred.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State submitted a brief; *Mr. Choate* argued the cause orally.

*Mr. Henry C. Smith,* for Respondent, submitted a brief and argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Julius Peters appears on the roll of this court as a duly licensed and practicing attorney and counselor at law. For a number of years prior to the failure of the Commercial National Bank of Great Falls in 1922 Mr. Peters was attorney for the institution, and, in addition thereto, was one of the board of directors and actively connected with the management of the bank. After the failure of the bank, a federal grand jury returned an indictment charging Peters, Robert B. Noble and Edward R. Funk with making, and causing to be made, false reports with the intent to deceive the comptroller of the currency and any agent or examiner appointed to examine the affairs of the bank. A trial was had in the United States district court at Great Falls, resulting in the conviction of Peters and Noble, and on the judgment of conviction each was sentenced to a term of two and one-half years in the federal prison at Leavenworth. From the judgment the two defendants prosecuted separate appeals, resulting in affirmance by the circuit court of appeals. A certified copy of the record of conviction has been filed in this court by the clerk of the United States district court.

Upon the facts heretofore set out, the attorney general has filed herein a complaint charging that Peters, as a duly

licensed and practicing attorney at law, has been guilty of such professional misconduct as to authorize and warrant his disbarment. The answer to the complaint admits the charge and conviction, but denies that the offense charged involves moral turpitude, or that Peters was guilty of moral turpitude, and further alleges that the evidence adduced on his trial did not disclose any moral turpitude on his part. The answer also alleges that Peters has never been convicted of any offense which was or is a felony or misdemeanor under the laws of this state, and that the charge on which he was convicted in the federal court is neither a felony nor a misdemeanor under the state laws.

The attorney general admits that all that is said in behalf of Peters may be true, but contends that: (1) Disbarment may be based upon a conviction in the federal court as well as in the state courts; and (2) a conviction being shown, the court should go no further than to consider the record of conviction.

Counsel for Peters, on the other hand, contends that, the conviction not being had in a state court, the question of moral turpitude is one of fact to be determined from the record by this court, and asks that we consider the transcript of the evidence taken on the trial in the federal court. He further contends that the crime of which Peters was convicted was merely *malum prohibitum*, an infraction of the banking laws, and that no one was injured thereby.

That the attorney general recognizes a distinction between a conviction in the state courts and in the federal court would seem to be fairly inferable from the fact that he filed a complaint herein, and had process issued and served upon Peters.

Section 8961, Revised Codes of 1921, provides: "An attorney * * . * may be removed or suspended for any of the following causes: * * * 1. His conviction of a felony

or misdemeanor involving moral turpitude, in which case the record of conviction is conclusive evidence.''

Section 10502 declares: ''Conclusive evidence or unanswerable evidence is that which the law does not permit to be contradicted.''

If the conviction here charged comes within the provisions of section 8961, it was therefore, not necessary to file a complaint nor to have process issued or served. (*In re Bloor*, 21 Mont. 49, 52 Pac. 779.) This court will on its own motion and on the record of conviction alone strike the name of the attorney so convicted from the roll. (Sec. 8963, Revised Codes of 1921; *In re Bloor, supra; In re Wellcome*, 23 Mont. 140, 58 Pac. 45; *In re Sutton*, 50 Mont. 88, Ann. Cas. 1917A, 1223, 145 Pac. 6; *In re Thresher*, 54 Mont. 474, 170 Pac. 1163.) But where the proceedings come within any other subdivision of section 8961, complaint must be filed and citation issued and served, as was done in this case. (Sec. 8963.)

1. We are of the opinion that the language of subdivision 1, section 8961, is sufficiently broad to warrant and demand action on the part of this court whenever it is brought to its attention that an attorney of this state has been convicted of a felony or misdemeanor involving moral turpitude, whether the conviction is had in a state court or in the federal court. The section quoted does not mention the state courts, but declares broadly that conviction of a felony or misdemeanor involving moral turpitude is ground for removal or suspension. The same question was raised in South Dakota, under a like statute, and determined adversely to the contention of respondent. (*In re Kirby*, 10 S. D. 322, 414, 39 L. R. A. 856, 859, 73 N. W. 92, 907.)

We are not concerned with the technical question as to [2] whether the crime for the commission of which the attorney is convicted was presented to a court of this state, of a sister state, or a federal court, but only as to whether

an attorney has so far misconducted himself as to be con-
victed of a felony or a misdemeanor involving moral turpi-
tude, and, therefore demonstrated that he is unworthy of
the trust reposed in him by the court when it admitted him
to practice.

The purposes of removal of an attorney are to purge the
profession of those who lower its high standards and bring
an honorable calling into disrepute and contempt, and to
protect the public at large, and the courts, from the acts
of the unscrupulous. As was said in *Re Thresher*, 33 Mont.
441, 114 Am. St. Rep. 834, 8 Ann. Cas. 845, 84 Pac. 876:
"This proceeding is in no sense a criminal prosecution, nor
is it in aid of a criminal investigation. Its purpose is to
ascertain whether the accused is worthy of confidence and
possessed of that good moral character which is a condition
precedent to the privilege of practicing law and of continu-
ing the practice thereof. * * * 'The end to be attained is
not punishment, but protection.' "

However, the responsibility resting upon us is twofold: An
attorney is an officer of the court; he holds an honorable
position in his community, and his disbarment deprives him,
not only of his chosen means of making a livelihood for him-
self and family, but of the confidence and respect of his
fellows, and such action will only be taken when the mem-.
bers of this court are convinced of its necessity for the pur-
poses above enumerated.

Ordinarily the "record of conviction" shows on its face
[3] whether the conviction was of "a felony or misde-
meanor involving moral turpitude"; the nature of the crime
charged discloses whether it comes within the statute or
not; and, if it appears from the record that it is within
the purview of the statute, the court will go .no further.
The only question then open to the court is, has there been
a conviction? "The question of guilt is not involved, * * *
the issue was not whether the defendant was guilty of the

crime charged in the criminal action but was he convicted?"
(*In re Kirby*, 10 S. D. 322, 39 L. R. A. 856, 73 N. W. 92.)
"If accused is, in fact, innocent of the crime of which he
was convicted, his situation is indeed unfortunate; if he is,
in fact, guilty, it is equally, if not more unfortunate; but
in neither event is this court responsible for his conviction
or conduct." (*In re Kirby*, 10 S. D. 414, 39 L. R. A. 859,
72 N. W. 907.)

But as counsel contends that the crime of which Peters
[4, 5] was convicted does not involve moral turpitude, and
as Peters has long enjoyed the confidence of this court, and
the record hereinafter referred to discloses that he derived
no benefit or profit to himself from the transactions which led
to his conviction, but, on the contrary, ruined himself finan-
cially as well as socially in an attempt to keep the bank
going, in justice to him we will pass the question whether
he was convicted of a felony or a misdemeanor, and the
question whether, under the statute, where the conviction
is for the commission of a felony, the limiting clause "in-
volving moral turpitude" is to be considered, and resolve
the question only whether the crime of which he was con-
victed involved moral turpitude. To this end we have care-
fully read the entire record of the trial before the federal
court, bearing in mind the approved definition of the phrase,
which is: "Everything done contrary to justice, honesty,
modesty or good morals, is said to be done with turpitude."
(2 Bouvier's Law Dictionary, 759; *In re Hopkins*, 54 Wash.
569, 103 Pac. 805; *Holloway* v. *Holloway*, 126 Ga. 459, 115
Am. St. Rep. 102, 7 Ann. Cas. 1164, 7 L. R. A. (n. s.)
272, 55 S. E. 191.)

The record discloses that of Peters' codefendants, Noble
was, at the times charged in the indictment, vice-president
and manager, and Funk assistant cashier; that the bank
was financially involved long prior to the date on which it

73 Mont.—19

finally closed its doors; that it continued open during this period was due, perhaps, to the heroic efforts of Peters and Noble, and that Peters, in his efforts to save the institution, sacrificed a considerable personal fortune. The efforts of these two men were commendable, providing they did not violate the law, and, in the attempt to save the institution, injure those who trusted them with deposits. However, it would seem the secret of the life of the institution for nearly a year prior to the closing of its doors, was disclosed, after the receiver took charge, in a series of false entries in the books of the bank, and reflected in its reports, on call, to the comptroller of the currency, and which showed to that official a stability which the institution did not in fact possess.

The indictment contains twenty-seven counts, each alleging that on a certain day the defendants did "willfully, wrongfully, unlawfully, and feloniously, and with intent to deceive the comptroller of the currency and any agent or examiner appointed to examine the affairs of the said member bank, make and cause to be made in certain books" certain debits to outside banks, and corresponding credits to the personal accounts of Peters and Noble, which were false and known to the defendants to be false. The first set of these false entries were made on December 19, 1921, and consisted of a charge against the First National Bank of St. Paul of $50,000, a charge against the Bank of California of $50,000, and credits to the account of Peters and Noble, each of $50,000. This gave to the bank the appearance of having $100,000 on hand, more than it had in fact. As soon as the report had gone to the comptroller, the charges were reversed. The same thing was done in February, 1922, except that the amounts were doubled. In June, 1922, the practice was repeated, the charges and credits being of $50,000 each, and repeated in September.

It appears that all of the entries were made by Funk, at the direction of Noble, and that Peters was directly connected up with only the first set of entries, his connection therewith being as follows: On December 9, 1921, Peters wrote to one Hanson, of the St. Paul bank, and to Mark Skinner, of Portland, the letters being as follows:

"Law Offices, Peters & Smith,
"Great Falls, Montana.

"Julius C. Peters,
"La Rue Smith.

"Mr. I. E. Hanson, St. Paul, Minnesota—Dear Mr. Hanson: The first week after the, closing of the American has passed. There has been a little shifting of accounts, but we have noticed no particular unrest, and our reserve has not been abnormally impaired. We have about $400,000 available. However, Mr. Noble and I have been in close conference during the past week, and we have taken into consideration every single angle, and we believe there is no occasion for alarm but we do feel that we should show a strong statement for the next call, and Mr. Noble and I should like you to have you use our joint note for this period, and place the same to the credit of the Commercial National Bank. We, of course, do not contemplate using any part of it, and to take up the note at maturity. Ordinarily, I would not approve of this method, but I feel that under the circumstances we are justified in handling the matter in this way, as we want to get through this crisis without adding to our bills payable. Mr. Hamilton is absent from the city, or he would join in the inclosed note. I hope you will grant this favor. We feel very comfortable and are confident of our ability to give a good account of ourselves in the early future. I will inclose my personal check in handling this item, should you consent to do so.

Thanking you for the consideration you are able to give
the matter,                    Yours truly,

"Julius C. Peters."

The answer was:

"First National Bank of St. Paul, Minnesota.

"December 14, 1921.

"Mr. Julius C. Peters,

   "Great Falls, Montana.

   "Dear Mr. Peters: We have your letter inclosing note of
$50,000, signed by Mr. Noble and yourself, dated Dec. 1,
1921, and maturing in fifteen days. We are returning the
note herewith, also the check, signed in blank, both without
use, as our committee would not favorably consider carry-
ing the paper and particularly not without collateral. In-
asmuch as the note did not reach us until December 13, and
would mature December 15, the return of the note without
credit would, we feel, not inconvenience you in any way.
Kindly acknowledge receipt.

                    "Yours very truly."

   At the same time Noble wrote a similar letter to one Al-
ward, of the Bank of California, at Tacoma, in which he
suggested that it was not necessary for Alward to advise
any one else of the transaction. The reply to this letter was
also a refusal of credit.

   Notwithstanding the fact that these efforts to secure a paper
loan for a few days, on promise that they would not use any
part of the credit so extended, had failed, on December 19
Noble directed Funk, to make the entries in the books.

   Peters testified on the trial that, at the time of writing
the letters quoted, he believed his standing such as to war-
rant the expectation that the credit asked would be extended
him, and that on receipt of the telegraphic refusal he took
the message to the bank, but that he did not see the Hanson

[73 Mont. 284.]

letter until in January, 1922, and that he then took it to the bank; that he had no knowledge of the entries.

Testimony was introduced on behalf of the prosecution that no letter, telegram, or other evidence of correspondence with the outside banks, so charged, was found in the records of the Commercial Bank; that the Peters. and Noble letters were written in longhand on personal stationery, and no copies kept or filed.

As to Peters' knowledge of the entries, it was pointed out that his letters showed on their face that he was attempting to secure fictitious loans for the very purpose of reflecting them in the reports to the comptroller; and one O. A. Carlson, the vice-president and active manager of the bank from February 1, 1922, to the date of closing, testified that the calls of the comptroller could be easily anticipated, and that just prior to the March 10 call he had a conversation with Noble in which Noble stated that ''Julius [Peters] and I have made arrangements for credit for the next call.'' And again, just prior to the June 10 call, Noble stated in the presence of the witness: ''Julius and I have not made arrangements for the call.'' The witness further testified: ''I was aware of the fact that entries were made charging banks with large sums and of giving credit to the defendants Peters and Noble, as shown by these books and these reversals. I discussed the practice with the defendants Noble and Peters; I asked them if they had made proper arrangements for the credit, and they told me that they had. I told them that it was an objectionable practice, and Mr. Noble said, 'Well; we have done that for a long time, and the bank examiners have never objected to it.' ''

While the indictment charged offenses only from December, 1921, the evidence showed that the practice extended as far back as April, 1921. In fairness to Peters, it may be said that the cross-examination of Carlson might warrant a

finding that the witness misstated, or was mistaken, when
he related his conversation with "Noble and Peters," and
that Peters was not present at the time. However, Peters
was, it must be remembered, a director of the bank, charge-
able with and responsible for the conduct of the business,
and directly chargeable by law with the duty of examining
and ascertaining the correctness of the reports to the comp-
troller of the currency, and that, by his own showing, he
was very much concerned over the condition of the bank
and in making a good showing to the comptroller. It fur-
ther appears from his letters that, during all of this time, he
was in close conference with Noble, devising ways and means
of making such a showing; that to this end he wrote the
quoted letters for the very purpose of obtaining a fictitious
credit to be reflected in the reports, as they were. It does
not seem credible that, being so concerned and having made
such an attempt—which method, as he states in his letter,
he would not ordinarily approve—and having failed, he
would have lost interest in making a favorable showing, and
have not known thereafter how the showing was made, or
by what method the comptroller of the currency was in-
duced to refrain from taking action against the bank for
a period of ten months after his abortive attempts.

Peters testified that during all of that period he did not
see his personal balance sheet from the bank, as his private
secretary always got it. Even so, it would seem that, busy
though he was, a man worried as was Peters over the con-
dition of the bank in which he was sinking his personal
means in a laudable attempt to save it, would, at some time
during the ten months, have looked into the condition of his
personal account therein, and thus discovered, if he did not
already know of the fact, that every three or four months
he was credited with $50,000 to $100,000, and a few days
thereafter was debited with a like amount. He attended
many meetings of the board of directors during that period,

[73 Mont. 284.]

and, on two occasions, secured loans from the bank approved by the board, and must have had some idea as to the condition of his account with the bank.

We are reluctantly forced to the conclusion, from the record submitted to us, that Peters knew that the false entries were being made, and connived in the making thereof, even though he did not direct the making of such entries, and that therefore he was as culpable as was his associate, Noble.

Counsel for Peters contends that there is nothing showing moral turpitude in such conduct, as the making of the reports is but a violation of the laws regulating the conduct of national banks, and no one was injured thereby. But, in this connection, we cannot lose sight of the fact that those regulations were made for the purpose of enabling the comptroller of the currency to protect, by appropriate action, the depositors and customers of such bank, when the reports show a weakened condition of the bank, nor that the action taken by these men was for the purpose of lulling the comptroller into fancied security as to the financial standing of this particular bank and therefore permitting the bank to continue in business long after it should have been placed in the hands of a receiver. If, by so doing, the bank was kept open long after it should have been closed, those who deposited with it, on faith, of its fictitious showing of stability, certainly were injured by the action of its officers in thus preventing its closing.

And, even though Peters did not know of the entries made, and did not examine the reports to the comptroller, as it was his duty to do, he knew of the attempts to prepare for those very entries and reports and took part in that preparation. The practice of securing loans for a few days only, with the express promise, as disclosed in Peters' letters, not to use the funds thus appearing on paper to have been secured, but to "take up the note at maturity,"

merely by reversing the charges, is in itself fraudulent. The attempt to justify this practice, also contained in the letters written by Peters, on the ground of an emergency, shows that Peters knew that such practice was wrongful.

The learned trial judge and the jury in the federal court took the position that, as Peters was shown to have made a fraudulent attempt to secure fictitious loans for the purpose of having them reflected in the reports to the comptroller, this fact, coupled with the suggestive matter contained in his letters for that purpose, was sufficient to justify the finding that he did cause the false entries to be made, and with this deduction we must agree.

That the offense for which Peters was convicted does involve moral turpitude is apparent; that he was convicted is admitted, and from the record it is clear to us that he participated in, condoned and connived in the wrongful and illegal practices complained of.

Sufficient cause having therefore been shown for the suspension or removal of the said Julius C. Peters, under the law, the judgment of the court is that the said Julius C. Peters be removed from his office as attorney and counselor at law, and that his name be stricken from the roll.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, GALEN and STARK concur.