# CHARLES FULTON RHEB *v.* THE BAR ASSOCIATION OF BALTIMORE CITY

[No. 98, October Term, 1945.]

*Decided March 15, 1946.*

The cause was argued before DELAPLAINE, COLLINS, GRASON, and HENDERSON, JJ.

*Hilary W. Gans,* with whom was *Leo M. Alpert* on the brief, for the appellant.

*Nathan Patz* and *Clater W. Smith* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This is an appeal from an order of the Supreme Bench of Baltimore City, passed July 10, 1945, disbarring the appellant, Charles Fulton Rheb, from the further practice of law. The appeal comes to this Court under Section 17, Article 10 of the Code, 1939, providing: "The Court of Appeals shall have the right to review the entire proceedings and affirm, modify, alter or reverse the order from which said appeal is taken as the substantial merits of the cause and the ends of justice may require."

On May 4, 1944, the appellant plead guilty, in the United States District Court for the District of Maryland, to an indictment charging him with wilfully, knowingly and unlawfully failing to make income tax returns to the Federal Government for the years 1940, 1941 and 1942, and failing to keep records for the same periods,

in violation of Section 145 (a), title 26 U. S. C. A. Int. Rev. Code. He was sentenced to six months imprisonment and a fine of $2,500. On March 15, 1945, the Supreme Bench of Baltimore City cited Rheb to show cause why he should not be disbarred for "the misconduct as shown in the records of the case of United States v. Charles Fulton Rheb." The appellant filed an answer admitting the conviction and sentence but contending that the Federal crime did not involve moral turpitude, was not based on any acts or omissions in his capacity as an attorney at law, did not involve such conduct as required or warranted disbarment under Sections 12 to 21, inclusive, of Article 10 of the Maryland Code, and that the citation was not in compliance with the Code.

Thereafter, on April 23, 1945, the Bar Association of Baltimore City, by the order and leave of the Supreme Bench, filed a petition for the disbarment of appellant, alleging misconduct, in the evasion of income tax payments "wilfully and deliberately done for the purpose of deceiving the Government of the United States of America and for the purpose of defrauding it of his known income tax liability." An answer was duly filed to this petition. On June 2, 1945, the Bar Association filed a petition asking leave to amend its original petition, because of information received subsequent to its filing, setting up in detail misconduct of the appellant in connection with other transactions, notably, his organization of a Maryland corporation known as "Lloyds Acceptance & Discount Corporation," fraudulent sale of stock therein, and the fraudulent obtention of property and moneys from a Mrs. Beatrice A. Doing. Leave was granted by order of court, the appellant filed an answer to these additional charges, and the matter came to trial, resulting in the disbarment order from which this appeal is taken.

Section 16 of Article 10 of the Code (as enacted by Chapter 370 of the Acts of 1929) sets forth the statutory grounds of disbarment as follows: "Professional

misconduct, malpractice, fraud, deceit, crime involving moral turpitude, or conduct prejudicial to the administration of justice." The appellant contends (1) the power of the Supreme Bench to disbar attorneys is limited to these grounds, (2) the facts and circumstances upon which the appellant was convicted in the Federal Court do not establish his guilt of a crime involving moral turpitude, and (3) the facts and circumstances as to the Lloyds corporation and the separation of Mrs. Doing and her money, do not sufficiently connect the appellant with deceit or misrepresentation, and thereby establish grounds for his disbarment.

We need not consider the question whether, in the abstract, the power to disbar or discipline attorneys is inherent in the courts. The case comes here on appeal based only upon the statute. This Court pointed out in *Re Williams*, 1941, 180 Md. 689, 23 A. 2d 7, that there was no right of appeal in disbarment cases prior to the Act of 1929. Since the adoption of the Constitutional amendment (Art. IV, Sec. 18A, effective January 1, 1945) conferring or confirming the power of this Court "to regulate and revise the practice and procedure in that Court and in the other courts of this State, which shall have the force of law until rescinded, changed or modified by the Court of Appeals or otherwise by law," it may be that matters relating to disbarment or discipline could be covered by rules. But it should be noted that regulation "otherwise by law" is not excluded, and it appears that since the comprehensive and remedial Act of 1929, neither this Court nor the Supreme Bench of Baltimore City has adopted any rules upon the subject. Moreover, the action of the Supreme Bench was not predicated upon the assertion of powers independent of the statute above quoted, and for the purposes of this case we shall assume that the Court's action is sustainable only upon one or more of the broad grounds therein set forth. "The statute has done but little, if anything, more than enact the general rules upon which the courts

of common law have always acted." *Ex parte Secombe,* 19 How. 9, 13, 15 L. Ed. 565.

The appellant contends that the crime for which he was convicted in the Federal Court involved private, perconal misconduct, and not misconduct as an attorney. It is true that the courts generally recognize that indulgence in what might be termed the minor vices, of a purely personal character, does not amount to professional misconduct. See note 36, *Yale L. J.* 875. We have no quarrel with this principle, but it can hardly be applied in the case at bar. The appellant testified that he had been practicing law since 1932, but that he had never filed an income tax return of his personal income, Federal or State. He admitted that he made $6,500 in 1939 (as to which limitations prevented indictment), that he made from $7,500 to $10,000 in each of the years 1940 and 1941, and "a top of $7,500 in 1942." He admitted knowing the requirements of law in regard to returns, testified that he made returns for others, attributed his own failure to "just pure neglect." These admissions, coupled with his admitted failure to keep adequate records, justify a finding that he deliberately failed to make returns or keep records, for the purpose of cheating the Federal Government and the State of Maryland out of taxes justly due. We think it is immaterial whether the federal crime is to be classed as a misdemeanor or a felony, an act of omission or commission. Such conduct might properly be characterized as fraud or deceit, even if it did not involve moral turpitude.

However, the authorities support the proposition that a crime of this character, even though not a felony, involves moral turpitude. It is generally recognized that crimes in the category *crimen falsi* involve moral turpitude. See *Bradway, "Moral Turpitude as the Criterion of Offenses that Justify Disbarment."* 24 Cal. L. R. 9. In *Re Diesen,* 173 Minn. 297, 215 N. W. 427, 217 N. W. 356, an attorney was disbarred on the strength of a conviction of the misdemeanor of making a false income tax

return. See also *In re Wiltsie,* 109 Wash. 261, 186 P. 848, and *In re Peters,* 73 Mont. 284, 235 P. 772, involving false reports.

In *Board of Dental Examiners v. Lazzell,* 172 Md. 314, 320, 191 A. 240, this Court held that a dentist, who had been convicted of indecent exposure, was properly deprived of his license to practice dentistry under a statutory provision authorizing revocation of license for a crime involving moral turpitude, although it was contended that this was a personal, not a professional, offense. This Court cited a number of cases relating to the disbarment of lawyers, by way of analogy, particularly *In re Coffey,* 123 Cal. 522, 56 P. 448, 449, where it was held that attempted extortion was a crime involving moral turpitude, "not an act innocent in itself, and only wrong because prohibited by the statute law."

The Maryland statute relating to the disbarment of lawyers, which contains not only the phrase "crime involving moral turpitude" but also the phrase "conduct prejudicial to the administration of justice," delegates or confirms to the courts the power and duty to consider particular conduct of one who is an officer of the court, in relation to the privileges and duties of a public calling that specially invites complete trust and confidence. We decline to give to the phrase last quoted a restricted meaning. In the last analysis the duty rests upon the courts, and the profession as a whole, to uphold the highest standards of professional conduct and to protect the public from imposition by the unfit or unscrupulous practitioner. As was said by Lord Mansfield long ago: "The question is, whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion. * * * It is not by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted is a proper person to be continued on the roll or not." *Ex parte Brounsall,* 1178, 2 Cowp. 829. In that case an attor-

ney had been convicted of stealing a guinea, and receiving the benefit of clergy, had been branded in the hand. Without prolonging our opinion on this branch of the case, we hold that the appellant's offense was of such a character as to justify disbarment.

We think the other acts of alleged misconduct, shown by the record, also justify the action taken. Stated as briefly as possible, the record shows that Rheb formed a corporation early in 1940 to deal in the purchase and sale of commercial paper. One Harris, his associate, undertook to sell $50,000 worth of stock in the enterprise. Although the charter authorized the issuance of 15,000 shares of common stock to Rheb, and 15,000 shares of stock to one Charles M. Trammel, "in consideration of cash and legal services rendered in the organization of said corporation, all of which have a fair and reasonable value at least equal to the value of said stock," it is not shown that any stock was ever issued. Rheb testified at one point that 200 shares were issued to Harris, but it was not shown that any cash consideration was paid to the corporation by Harris. Harris was the president, Rheb was vice-president, secretary and treasurer. The principal office was given as 304 Equitable Building, Baltimore, Md., which was the appellant's law office. A bank account was opened in the corporation name, checks to be signed by both Rheb and Harris. The initial deposit was of $300, composed of three items, $250, $25 and $25. Trammel testified that he supplied the $250; Rheb denied this and testified that he (Rheb) did. It was not shown that any commercial paper was ever transferred to the corporation. On August 20, 1940, its bank balance was $106.55.

On that date, Harris visited a widow, Mrs. Beatrice Doing, at Ulysses, Pennsylvania. She testified he told her that the corporation "was a very well organized organization, they had a large bank building, and he was President, and Mr. Rheb was vice-president, and * * * Secretary and Treasurer, and they were doing a good

substantial business, and that any investment I might make with them would very well return on my investment, so he persuaded me to turn over my stocks and my holdings to them, with the assurance that I would receive anywhere from 7 to 10 percent as a return." A few days later she received a letter from Trammel recommending Harris to her.

The appellant admits that Harris turned out to be a swindler. He contends that Harris obtained his hold over Mrs. Doing through promise of marriage (Mrs. Doing denies this). Rheb contends that he did not know about Harris' representations to her, either business or personal. It is shown, however, that Harris called Rheb on the telephone and introduced Mrs. Doing to him "as a new stockholder," and that she later came to Baltimore and called upon Rheb at his office. There was a sharp conflict in the testimony as to what Rheb told her about the corporate affairs.

At his first visit Harris obtained from Mrs. Doing, among other things, her deed for a property in Coldwater, Michigan, two mortgages on properties in Brooklyn, New York, one for $2,000 and the other for $3,300, and $500 preferred stock of the North Penn Gas Company. He was to convert them into cash, and invest the proceeds in stock of the corporation. Rheb prepared deeds effecting transfer of the Coldwater property from Mrs. Doing to Harris, and from Harris to a purchaser. Mrs. Doing claims that both Harris and Rheb told her the proceeds of this sale were $2,800, but she learned from the Michigan real estate agent that the proceeds were $3,300, and they gave her a check for $500 drawn on the corporation account, in which the check for $3,300 had been deposited, to make up the difference.

Later, Harris and Rheb purchased a house for Mrs. Doing on Eutaw Place in Baltimore. Harris procured a contract of sale for $3,900, upon which he made a deposit of $250. She testified that they both told her they had purchased it for her for $5,000. She put up $1,500, and Rheb created a $120 ground rent, to reimbuse him-

self for a $2,000 advance he made to Harris, making a total of $3,750. The difference of $150 was never explained. Rheb took care of the settlement on or about October 22, 1940, and sent Mrs. Doing a settlement sheet showing the purchase price to be $5,000, although the deed ran from the vendors to her, and the assigned contract of sale showed the consideration to be $3,900. Rheb testified that he received a fee of $75 from Harris for his services in this transaction. On January 13, 1941, Mrs. Doing learned from counsel for the vendors that the purchase price was $3,900, rather than $5,000, and that it included furniture which was not in the house when she moved in.

On January 10, 1941, Rheb and Harris drew a check for $70 on the corporate bank account in favor of Mrs. Doing and gave it to her. This purported to be a dividend out of corporate profits, at the rate of 2½ per cent. upon the 2,800 shares of preferred stock they conceded she was entitled to although no certificate had been issued. On the same day, in Rheb's office, she assigned to Harris the mortgage she owned upon property in Brooklyn, New York. On January 13, 1941, Mrs. Doing came to Rheb's office to demand an accounting. Rheb prepared a stock certificate, but did not deliver it to her.

In February, 1941, Mrs. Doing was approached by one Norman Bowles, with a suggestion that she compromise her claims against Harris and Rheb for $750. He told her the corporation "isn't worth a nickel." She told him "that's ridiculous, $750 for $15,000 worth of assets." Subsequently, she accepted $750 from Bowles and signed a release of the corporation, Harris and Rheb from further liability. Some months later she consulted Baltimore counsel, who obtained for her a settlement of $3,500 from Rheb on May 11, 1942. In the meantime Harris had been convicted and sentenced for other activities of a criminal nature, the details of which do not appear in this record.

Rheb testified that he became suspicious of Harris in February or March, 1941, and sent him a letter resigning

his connection with the corporation. He was unable to produce a copy of this letter. He also testified he turned over to Harris the books, accounts, cancelled checks, and other corporate records. None of these records were ever produced. Rheb testified that twelve or fifteen other people bought stock in the corporation, but there was no proof of this. The statements obtained from the bank showed that between July 16, 1940, when the account was opened, and May 26, 1941, when the balance was $10.05, there was deposited in the account some $22,000, represented by twenty-eight deposits. This fund was disbursed in 186 withdrawals for undisclosed purposes upon checks which Rheb and Harris both signed. Rheb testified that none of the officers of the company drew salaries. There was testimony that a vacant building on North Avenue was leased for one year as an office.

It seems clear from the testimony that the transaction whereby Harris, with Rheb's approval, undertook to sell stock in a corporation having no assets, was colorable and fraudulent from the start. Rheb was definitely a party to this scheme, as he was a party to the payment of an alleged dividend to Mrs. Doing out of non-existent profits. He also knew that on at least two occasions, the Coldwater transaction and the Eutaw Place transaction, Harris attempted to make a secret profit at the expense of his principal. Rheb assisted his associate and avowed client in the breach of a confidential relation. Compare *Nagle v. Todd,* 185 Md. 512, 45 A. 2d 326. This was professional misconduct. The appellant's brief admits as much, but submits that censure or a short suspension would be an appropriate remedy.

Our conclusion upon the whole case is that appellant, on this record, has shown himself to be unfit for the further practice of law, and considering the substantial merits of the cause and the ends of justice, we affirm the order appealed from.

*Order affirmed, with costs.*