## ATTORNEY GRIEVANCE COMMISSION OF MARYLAND *v.* HARRY DAVIS BARNES

[Misc. Docket (Subtitle BV) No. 19, September Term, 1978.]

*Decided December 11, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*J. Martin McDonough, Jr., Assistant Bar Counsel,* for Attorney Grievance Commission.

*Charles E. Chlan* for Harry Davis Barnes.

MURPHY, C. J., delivered the opinion of the Court. COLE and DAVIDSON, JJ., dissent. DAVIDSON, J., filed a dissenting opinion at page 481 *infra,* in which COLE, J., concurs.

Harry Davis Barnes, a member of the Maryland Bar for thirty-nine years, was indicted by a Grand Jury in the United States District Court for the District of Maryland for willful failure to file federal income tax returns for 1969 and 1970 — misdemeanor offenses violative of 26 U.S.C. § 7203 (1976).[1]

On February 10, 1976, the District Court accepted Barnes' guilty plea to willful failure to file his 1970 return. It entered a judgment of conviction, suspended the imposition of sentence, placed Barnes on probation for five years, and fined him $1,000. The government entered a nolle pros on the count of the indictment charging failure to file the 1969 return.

The Attorney Grievance Commission, acting through Bar Counsel, subsequently filed a disciplinary petition against Barnes, charging that his misconduct violated Disciplinary Rule 1-102 of the Code of Professional Responsibility, *i.e.:*

"(A) A lawyer shall not:

   (1) Violate a Disciplinary Rule.
   (2) Circumvent a Disciplinary Rule through actions of another.
   (3) Engage in illegal conduct involving moral turpitude.
   (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

---

1. "Any person required under this title to pay any estimated tax or tax, or required by this title . . . to make a return . . ., who willfully fails to pay such estimated tax or tax, [or] make such return . . ., shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution."

(5) Engage in conduct that is prejudicial to the administration of justice.

(6) Engage in any other conduct that adversely reflects on his fitness to practice law."

At the evidentiary hearing held on the Commission's disciplinary petition, Barnes admitted that he did not file his 1969 and 1970 tax returns. His failure to do so, he said, was not willful but was the result of various personal, marital and family problems with which he was plagued during those years. Barnes testified that on January 13, 1969, and again on September 13, 1970, the Ku Klux Klan burned crosses on the lawn of his home in Elkton in retaliation for his long-standing support and legal representation of Black citizens, and because he provided legal counsel to the wives of Klansmen in domestic cases. Barnes said that he received numerous threats on his life from members of the Klan during 1969 and 1970 and was fearful that they would harm his wife, children and grandchildren who resided with him. He testified that he was afraid that the Klan would dynamite his house, as it had previously undertaken to do at the home of a Black community leader. As a result of his fears, Barnes employed a security guard to watch over his residence. Barnes testified that his wife lived in a state of hysteria and that so great did the stress become that he moved his family to Baltimore in early 1969, where he attempted to establish a law practice. Unsuccessful in this endeavor, Barnes returned to Elkton with his family in the summer of 1970, ultimately moving back into their former residence. During the period that he lived in Baltimore, Barnes maintained his office and legal practice in Elkton, commuting back and forth on a regular basis. Despite his difficulties, Barnes earned, according to the Internal Revenue Service, in excess of $46,000 in 1969 and over $55,000 in 1970.

In his testimony, Barnes recounted the business-related, marital and other family problems with which he was confronted in 1969 and 1970. He admitted that he was under a financial strain during this period. He said that he lost some of his records when his car was stolen and that he mislaid

others in the course of moving his family to Baltimore. This was "part of the reason," he said, that he did not file tax returns for 1969 and 1970.

Evidence was adduced at the hearing corroborative of the two cross burnings at Barnes' home in 1969 and 1970. The theft of Barnes' car, which he said contained his tax records, was not shown by the evidence to have been reported to the police. That Barnes did not voluntarily disclose to the I.R.S. that he had failed to file his 1969 and 1970 tax returns was conceded by him at the hearing. Barnes admitted that his crime was discovered by the I.R.S. in 1972 when he sought an extension of time to file his 1971 tax return.

Dr. Joseph Lanzi, Barnes' family physician since July of 1970, testified that Barnes suffered from obesity, high blood pressure, diabetes, hypothyroid disease, and blurry vision. He saw Barnes twelve to fourteen times in 1970 and five times in 1971 for his various medical problems. Dr. Lanzi said that Barnes told him that he worked seven days a week, ten hours per day. He testified that Barnes did not seem to be aware of the seriousness of his medical problems and did not follow medical advice. It was Dr. Lanzi's opinion, based on Barnes' medical condition, that he was not "responsible" for failing to file his income tax returns in 1969 or 1970.

Dr. Merrill Berman, a psychiatrist, testified that on September 13, 1975 he did a complete psychiatric evaluation of Barnes to determine whether, in not filing tax returns, Barnes harbored a criminal intent. Dr. Berman testified that Barnes was not psychotic, psychopathic, or neurotic, but instead suffered from a long-standing character disorder which he described as "chronic depressant" with some attributes of a passive-aggressive individual. Dr. Berman concluded that because of Barnes' medical condition, particularly his uncontrolled diabetes, he acted in a self-destructive and self-defeating manner; that the physical stress caused by the Klan's activities, which placed Barnes in fear of his life, affected his hypertension, diabetes, and depression and constituted medically mitigating reasons for his failure to file the tax returns. Dr. Berman said that Barnes' marital and other domestic problems contributed to

his stress and anxiety, causing him not to act in his own best interests. As a result of these stresses, and because Barnes' "top priority was saving his own life," Dr. Berman thought that no criminal intent was involved in Barnes' failure to file his tax return.

Upon consideration of this evidence, Judge Harry E. Clark, who was designated to hear the disciplinary charges pursuant to Maryland Rule BV10, concluded that "there can be no doubt that the Barnes' family lived in a state of terror during 1969 and 1970." He recognized that Barnes also suffered from poor health and had marital and other domestic problems. Judge Clark nevertheless found that Barnes' failure to file his 1969 and 1970 tax returns was willful; to otherwise conclude, he said, would be to "completely ignore the fact that during this period the Respondent was able to hold onto his law practice, generate gross income in excess of $85,000, safekeep his family and himself from harm and not engage in any bizarre behavior." Judge Clark was of the opinion that Barnes' willful failure to file his tax returns was a crime of moral turpitude and, as such, violated DR 1-102 (A) (1), (3) and (6).

Barnes took exception to Judge Clark's finding that his failure to file was "willful." The element of willfulness is, of course, an essential element of the offense to which Barnes pleaded guilty. As used in 26 U.S.C. § 7203, it is "a voluntary, intentional violation of a known legal duty, ... [and] not through accident or mistake or other innocent cause." *Attorney Grievance Comm'n v. Walman,* 280 Md. 453, 374 A.2d 354 (1977), citing cases at 460. The District Court, after accepting Barnes' guilty plea, and receiving evidence concerning his medical and psychiatric condition, said at the sentencing hearing: "I can understand what a psychologist means in terms of the pressures that were on you, but I cannot accept the ultimate conclusion, frankly, that you did not wilfully do what you were doing."

Under Maryland Rule BV10 e 1, Barnes' conviction, entered upon his guilty plea, is "conclusive proof" of his guilt and hence that his failure to file was willful. As we said in *Bar Ass'n of Balto. City v. Siegel,* 275 Md. 521, 527, 340 A.2d 710

(1975), the integrity of the criminal conviction "cannot be attacked in a disciplinary proceeding by invoking this Court to reweigh or to re-evaluate the respondent's guilt or innocence." To the same effect, *see Maryland St. Bar Ass'n v. Rosenberg,* 273 Md. 351, 329 A.2d 106 (1974); *Maryland St. Bar Ass'n v. Kerr,* 272 Md. 687, 326 A.2d 180 (1974).

Barnes also took exception to Judge Clark's finding that his failure to file was a crime involving moral turpitude. We said in *Maryland St. Bar Ass'n v. Agnew,* 271 Md. 543, 318 A.2d 811 (1974), that when an attorney is convicted of a crime of moral turpitude, disbarment follows automatically unless compelling extenuating circumstances are established. We defined "moral turpitude" as "an act of baseness, vileness, or depravity in the private and social duties which a man owes to his fellow men, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." *Braverman v. Bar Assn. of Balto.,* 209 Md. 328, 344, 121 A.2d 473, *cert. denied,* 352 U.S. 830 (1956). Because intent to defraud is not an element of the crime of willful failure to file income tax returns under 26 U.S.C. § 7203, the Court held in *Attorney Grievance Comm'n v. Walman, supra,* that the offense did not per se involve moral turpitude; rather, it depended on the particular facts of the individual case. The Court concluded in *Walman* (three judges dissenting) that because the attorney's failure to file tax returns for three consecutive years was not shown by the evidence to have been accompanied by a fraudulent or dishonest intent, or for the purpose of evading the ultimate payment of taxes, the crime was not one infected with moral turpitude. No showing was made in *Walman,* as the majority of the Court viewed the case, beyond the bare fact that the attorney's failure to file was based on his inability to pay the taxes due with the return. The Court nevertheless suspended Walman for three years on the ground that his misconduct was prejudicial to the administration of justice, as charged in the disciplinary petition. It said:

> "An attorney's willful failure to file income tax returns may seriously impair public confidence in the entire profession. The need, therefore, to maintain

public respect for the bar is a vital consideration in the imposition of disciplinary sanctions. The lawyer, after all, is intimately associated with administration of the law and should rightfully be expected to set an example in observing the law. By willfully failing to file his tax returns, a lawyer appears to the public to be placing himself above that law."
280 Md. at 464-65.

Unlike *Walman,* Barnes did not attribute his failure to file to an inability to pay his taxes, although notwithstanding his substantial income in 1969 and 1970, he did say, without elaboration, that he was under a financial strain during those years. Nor did Barnes attribute his failure to file to his medical problems. Rather, the root cause of his failure to file, according to his own testimony, centered entirely about his lost records, Klan harassment and marital and domestic problems. During this period, however, he maintained a thriving and lucrative law practice, working by his own admission seven days a week, ten hours a day. Moreover, the tax returns he omitted to file were not due until, respectively, April 15, 1970 and April 15, 1971 — in part at least beyond the height of the problems which he described in his testimony. As we have observed, Barnes' failure to file was not discovered by reason of any voluntary disclosure on his part; indeed it must be inferred that by going to the I.R.S. in 1972 for an extension of time to file his 1971 return, without disclosing his earlier failures to file, that Barnes intended to conceal his crime, and thus avoid the ultimate payment of his 1969 and 1970 taxes. We think that Barnes' misconduct, considered in the light of the total circumstances revealed by the record, involved moral turpitude since his intention was to cheat the government and his fellow citizens by avoiding payment of the substantial taxes justly due. That Barnes' tax records may have been lost, as he claimed, hardly excuses him from his duty to file — a known legal duty conclusively shown by his conviction to have been voluntarily and intentionally violated. *Attorney Grievance Comm'n v. Walman, supra,* 280 Md. at 460. As to the degree of discipline to which Barnes

should be subjected, we said in *Maryland St. Bar Ass'n v. Agnew, supra,* 271 Md. at 553:

> "[W]hen a member of the bar is shown to be willfully dishonest for personal gain by means of fraud, deceit, cheating or like conduct, absent the most compelling extenuating circumstances, . . . disbarment follow[s] as a matter of course."

There being no compelling extenuating circumstances in this case, the appropriate sanction is disbarment.[2]

*It is so ordered.*

*Davidson, J., dissenting:*

The majority recognizes the principles established in *Attorney Grievance Commission v. Walman,* 280 Md. 453, 374 A.2d 354 (1977), that the crime of willful failure to file income tax returns does not, in and of itself, involve moral turpitude, and that whether moral turpitude exists depends upon the particular facts of the individual case. The majority holds that under the facts of this case, the crime involved moral turpitude and that in the absence of compelling extenuating circumstances, disbarment is the appropriate sanction. In my view, while paying deference to the principles of *Walman,* the majority has undermined them to such an extent that the case has, in effect, been overruled. I respectfully dissent.

In *Walman,* the government discovered that an attorney had failed to pay Federal income taxes for three years. In the Federal District Court for the District of Maryland, he pled guilty to one count of "wilfully and knowingly" failing to file a Federal income tax return for 1968, and was sentenced to one month in jail and 23 months probation. Subsequently, he was disbarred from practice before that Court.

In a disciplinary action in Maryland, before a panel of three judges, evidence was presented to show the facts and

---

2. Barnes' contention that the proceedings against him should be dismissed under the doctrine of res judicata is utterly without merit. The contention is based on our dismissal of an earlier petition to suspend Barnes from the practice of law under Rule BV16, pending the filing of charges under Rule BV9. The dismissal was for purely procedural reasons and did not constitute an adjudication on the merits under Rule BV9.

circumstances surrounding the failure to file. At the time of his conviction, Walman had been a member of the Maryland Bar for nine years. He suffered from various physical ailments and had pressing financial responsibilities including the support of his grandparents as well as a brother and his two sons. He explained that he failed to file his tax returns because he did not have the money to pay. Indeed, he conceded that on one occasion he wrote a check for the balance due on his income tax, but did not mail it because, as a result of paying his nephew's college tuition, he no longer had sufficient funds. In addition, he conceded that when he failed to file, he knew that he was required to file and that he would not be criminally prosecuted if he failed to pay the money owed at that time. At the time of his conviction, he had not yet satisfied all his tax obligations. The panel recommended a one year suspension.

Before this Court, the Attorney Grievance Commission claimed that the crime involved moral turpitude and therefore required a greater sanction. Walman contended that because the crime had been committed without fraudulent intent, a reprimand was the appropriate sanction. Judge Levine, speaking for the majority of this Court, said:

> "Here, as we have intimated, no evidence has been presented to show that respondent's failure to file the returns was accompanied by a fraudulent or dishonest intent. Nor does the record reflect an intent to avoid the ultimate payment of taxes. There is no suggestion, for example, that respondent falsified records, made deceptive statements to Internal Revenue agents, testified untruthfully, committed any other act of dishonesty, or was guilty of further misconduct. No evidence has ever been uncovered by either the I.R.S. or petitioner to refute respondent's explanation for his conduct: that it resulted from his inability to pay. In short, there is no further showing, beyond the bare fact of conviction for failure to file his returns, to indicate that respondent's conduct was infected with moral

turpitude, as we have defined that term." [*Walman,* 280 Md. at 462, 374 A.2d at 360.]

The Court held that Walman, who had not voluntarily disclosed his failure to file, had not committed a crime involving moral turpitude. This case establishes that whether moral turpitude exists depends upon the totality of circumstances. The fact that an attorney has not voluntarily disclosed his failure to file is insufficient, in and of itself, to show the existence of moral turpitude.

In a dissenting opinion, the minority agreed with the principle that a willful failure to file is a crime which does not, in and of itself, involve moral turpitude, and that whether moral turpitude exists depends upon the facts of the case. The minority found that under the facts of the case, Walman's crime involved moral turpitude. In reaching that result, Chief Judge Murphy pointed out, in language strikingly similar to that of the majority opinion here, that:

> "Walman's failure to file federal tax returns for 1967, 1968 and 1969 *was not discovered by reason of any voluntary disclosure on his part,* but rather as a result of governmental investigation. His failure to file state income tax returns for 10 years was revealed, for the first time, on his cross-examination at the remand hearing. That Walman knew that he was required to file tax returns but need not then remit the tax due is conceded — indeed at one time Walman was employed by H & R Block Company as a tax specialist. These are facts and circumstances which shed light on, and lend meaning to, Walman's purposeful conduct in not filing his income tax returns; they spell out, in my judgment, a deliberate and unmistakable intention to cheat the government.
>
> . . .
>
> "I conclude that Walman's conviction for wilful failure to file his 1968 federal income tax return, considered in the light of the total circumstances revealed by the record, involved moral turpitude since his intention was to cheat the government out

of taxes justly due." (Emphasis added.) [*Walman,* 280 Md. at 468, 470, 374 A.2d at 363, 364.]

The evidence relied upon by the dissent to show moral turpitude consisted of the fact that Walman failed to file despite his knowledge that he was required to and could do so without paying, and the fact that he did not voluntarily disclose his crime. While Walman's knowledge supports an inference that he willfully failed to file, it does not support an inference that he intended to cheat the government, and therefore is not material to the question whether moral turpitude exists. Thus, Walman's failure voluntarily to disclose was the only evidence to show an intention to cheat, and therefore to show the existence of moral turpitude. Patently, the minority believed that the single factor of failure voluntarily to disclose was sufficient to establish moral turpitude.

In the instant case, the majority reaches the same result. The evidence upon which it relies to establish moral turpitude consists of the fact that, despite his personal difficulties, Barnes was able to function professionally, and the fact that he did not voluntarily disclose his crime. With respect to the latter, the majority says:

> "... Barnes' failure to file *was not discovered by reason of any voluntary disclosure on his part; indeed it must be inferred that by going to the I.R.S. in 1972 for an extension of time to file his 1971 return, without disclosing his earlier failures to file, that Barnes intended to conceal his crime, and thus avoid the ultimate payment of his 1969 and 1970 taxes.* We think that Barnes' misconduct, considered in the light of the total circumstances revealed by the record, involved moral turpitude since his intention was to cheat the government...." (Emphasis added.)

While Barnes' ability to function professionally supports an inference that he willfully failed to file, it does not support an inference that he intended to cheat the government, and therefore is not material to the question whether moral

turpitude exists. Thus, an inference drawn from Barnes' alleged failure to make a voluntary disclosure is the only evidence to show an intention to cheat and therefore to show the existence of moral turpitude. Patently, the majority now holds that the single factor of failure voluntarily to disclose is sufficient to establish moral turpitude. I cannot agree.

There is no evidence in the record to show that Barnes did not voluntarily disclose his failure to file to the IRS. The majority states:

"That Barnes did not voluntarily disclose to the I.R.S. that he had failed to file his 1969 and 1970 tax returns was conceded by him at the hearing. Barnes admitted that his crime was discovered by the I.R.S. in 1972 when he sought an extension of time to file his 1971 tax return."

At the hearing, Barnes appeared and testified. He explained his reasons for failing to file. He did not testify, on either direct or cross-examination, about any of the circumstances under which the IRS became aware of his failure to file. Indeed, at no time was he asked a question relating to this issue. Barnes himself did not admit that his crime was discovered by the IRS.

Furthermore, there was nothing at the hearing, other than the unsworn statements of Barnes' attorney, to support an inference that Barnes did not make a voluntary disclosure. At the hearing, in argument, Barnes' attorney said:

"When Mr. Barnes filed his tax return he asked for an extension, and he received a letter back from the Internal Revenue that they couldn't locate his last year's tax returns.

"Judge Rasin: What year was that?

"Mr. Chlan: That was in 1972. He brought the letter to me and told me he had not filed the '69 and '70 tax returns. We went down to the Internal Revenue Department, and he told them he had not filed. This was back in 1972, and we had a conference with them and agreed to do everything they asked,

and provided all they asked, and we did file the return in 1972, and paid all of the assessments and damages."

In my view, given the well-known investigative techniques of the IRS, the fact that Barnes filed a request for an extension of time in which to file his 1971 return supports an inference that he was attempting to straighten out his tax affairs, including those of past years.

Indeed, later in argument, Barnes' attorney, in distinguishing *Bar Association of Baltimore City v. McCourt,* 276 Md. 326, 347 A.2d 208 (1975), pointed out that McCourt was arrested and "didn't come in on his own voluntarily," whereas Barnes "went up there and turned himself in." Still later, in response to a question from the bench concerning the effect of Barnes' guilty plea, Barnes' attorney said that "we went in and told them [IRS] we did wrong."

Moreover, in oral argument before this Court, Barnes' attorney denied a suggestion from the bench that Barnes would never have filed his 1969 and 1970 tax returns if the IRS had not discovered independently that those returns had not been filed. In addition, he affirmatively asserted that Barnes' request for an extension of time within which to file his 1971 return included a request for an extension for his 1969 and 1970 returns as well. In response to further direct questions, Barnes' attorney conceded that the record was unclear and that he did not know whether Barnes had told the IRS or whether the IRS itself had discovered that Barnes had failed to file his 1969 and 1970 returns. He emphasized, however, that when he, on Barnes' behalf, told the IRS that Barnes had failed to file for 1969 and 1970, the IRS gave no indication that it already had this information. Finally, at oral argument before this Court, Bar Counsel conceded, in response to questions, that there was nothing in the record to show that Barnes had failed to inform the IRS that he had not filed his returns for 1969 or 1970.

Barnes' attorney's unsworn statements are not evidence, and even if they were, they would not, based upon the record here, support an inference that Barnes had not voluntarily

disclosed his failure to file. Accordingly, the unsworn statements by Barnes' attorney cannot be regarded as either a concession or admission by Barnes that he failed voluntarily to disclose his crime. In my view, in the absence of such an admission or concession, there is no evidence to show that Barnes failed voluntarily to disclose his crime.

Moreover, even if Barnes had not voluntarily disclosed his failure to file, that fact, as recognized by the majority in *Walman,* does not support an inference that he intended to cheat the government. In the absence of such an inference, there is no evidence to show moral turpitude.

Notwithstanding the majority's deference to the principles of *Walman,* it is holding that unless an offender voluntarily disclosed to the IRS his willful failure to file, that willful failure to file is, in and of itself, a crime involving moral turpitude. This result so substantially erodes the principle of *Walman* that the existence of moral turpitude depends upon the totality of circumstances, and not on the single factor of failure voluntarily to disclose, that *Walman,* in effect, becomes meaningless.

Here, the facts show circumstances more compelling than those in *Walman.* At the time of their respective convictions, Barnes had been a member of the Bar for 35 years, and Walman for nine. Barnes had failed to file Federal income taxes for two years, and Walman for three. Walman never contacted the IRS or made any effort to resolve his tax difficulties and had not paid any of his back taxes before he was indicted. Barnes, on the other hand, contacted the IRS and settled all of the tax claims against him before he was indicted. The judge who sentenced Barnes in the Federal District Court for the District of Maryland stated that he was certain Barnes would never break the law again. Walman was disbarred by the Federal District Court for the District of Maryland.

Both Walman and Barnes were under considerable stress. Walman's difficulties were confined to heavy financial demands made upon him by his family. Barnes' marital, family, and social difficulties were considerably more extensive. Both Walman and Barnes had physical problems.

While Walman's physician could not testify to a relationship between Walman's physical problems and his behavior, Barnes' physician testified that Barnes' variety of physical ailments were responsible for impairing his memory and his ability to function. There was no evidence to suggest that Walman suffered any psychiatric disability, but a psychiatrist testified that Barnes suffered from a character disorder. He was anxious and chronically depressed and exhibited some attributes of a passive-aggressive individual. He feared for his life and that of his family, and, given all his problems, the payment of taxes held a very low priority. The psychiatrist concluded that at the time of the offense Barnes was incapable of forming a criminal intent.

Barnes explained that his failure to pay was due to his constellation of problems including a loss of his records. Walman explained that his failure to pay resulted from his deliberate decision to divert to personal or family use the very funds with which he might have paid his taxes.

Finally, here as in *Walman,* there is no evidence to show that Barnes' failure to file was accompanied by a fraudulent or dishonest intent, or an intent to avoid the ultimate payment of taxes. There is no suggestion that Barnes falsified records, made deceptive statements to Internal Revenue agents, testified untruthfully, committed any other act of dishonesty, or was guilty of further misconduct. No evidence has ever been uncovered by the IRS or the Attorney Grievance Commission to refute Barnes' explanation that his conduct resulted from the stress and constellation of problems by which he was besieged. In short, there is no showing, beyond the bare fact of conviction for failure to file a return, to indicate that Barnes' conduct was infected with moral turpitude.

If the "particular facts of the individual case" here under consideration do not establish the absence of moral turpitude, the facts in no case ever will. The principle of *Walman,* that the crime of willful failure to file income tax returns does not, in and of itself, involve moral turpitude, no longer exists.

Based upon the totality of circumstances in this case, I would hold that Barnes did not commit a crime involving

moral turpitude, but did engage in "conduct prejudicial to the administration of justice" to which the sanctions of Maryland Rule BV11 apply. With respect to an appropriate sanction, Judge Levine said in *Walman:*

"In addition to the two reported decisions we mentioned earlier, *Rheb v. Bar Ass'n of Baltimore,* [186 Md. 200, 46 A.2d 289 (1946)] and *Bar Ass'n of Balto. City v. McCourt,* [276 Md. 326, 347 A.2d 208 (1975)] . . . we have dealt with the crime charged here in two unreported cases since 1970, the year in which we assumed original and complete jurisdiction over disciplinary proceedings. In each of those two cases we adopted the recommendation of a three-judge panel that a one-year suspension be imposed. We subsequently did likewise in *McCourt,* where more extensive mitigating circumstances were established. The ultimate sanction of disbarment was imposed in *Rheb,* but there, as we have noted, the misconduct of the attorney extended well beyond his failure to file.[1]

"Respondent concedes not only that he diverted to personal or family use the very funds with which he might have paid part, if not all, of the taxes which he owed, but also that he could have avoided criminal prosecution, in any event, by merely filing his returns as required by law. This case therefore lacks the mitigating circumstances found in *Bar Ass'n of Balto. City v. McCourt,* 276 Md. at 330, in which the testimony of a psychiatrist revealed that the criminal conduct was related to a 'passive-aggressive' neurotic personality disorder.

"On this record, we agree with the panel below that disbarment is not warranted, but we conclude that the purposes to be served by these disciplinary proceedings will be met by a suspension of three

---

1. In *Rheb,* the attorney had, in addition to failing to file for 12 years, failed to keep proper tax records, engaged in the fraudulent sale of stock, and obtained money and real property fraudulently.

years. . . ." (Footnote omitted.) [*Walman,* 280 Md. at 465-66, 374 A.2d at 361-62.]

On the record before me, because the facts are more compelling than those in *Walman,* and contain the mitigating circumstances found in *McCourt,* I would conclude that a suspension of one year would be appropriate.

Judge Cole has authorized me to state that he concurs with the views expressed herein.