STATE ex rel. TURNER et al. v. DENMAN et al.—259 S. W. (2d) 891.

Middle Section.   December 12, 1952.

Petition for Certiorari denied by Supreme Court, June 5, 1953.

Frank N. Bratton, of Athens, and James F. Corn, of Cleveland, for appellants.

E. B. Baker, of Chattanooga, for Dan Massey. Harry Burke, of Chattanooga, for Steven C. Stone, and Robert L. Denman, of Chattanooga, pro se.

HICKERSON, J. The bill was filed on behalf of the Chattanooga Bar Association by and through its Grievance Committee to disbar Robert L. Denman, Dan Massey, and Steven C. Stone from practicing law and to enjoin Ralph Gunn, a layman in the legal field, from soliciting legal business for lawyers.

Complainants charged in their bill that defendants had been guilty of unprofessional conduct in the following particulars: (1) Soliciting business; (2) Mr. Denman and Mr. Massey, partners, representing opposing sides in the same controversy; (3) Dan Massey and Steven C. Stone trying, by threats, to prevent complainants from interviewing witnesses in the case on trial; (4) Mr. Stone made false statements to an opposing Attorney relating to legal matters in which they were interested; (5) The three defendants followed a pattern of unethical conduct which showed that they did not have the proper conception of the correct conduct of a lawyer;and (6) Defendant Gunn was engaged in soliciting legal business for Denman, Massey, and Stone.

Various specific cases of alleged unethical conduct were stated in the bill.

The three partners, Denman, Massey, and Stone, filed separate answers in which they denied all the material allegations of the bill.

Upon a full hearing on oral testimony, depositions, and exhibits, the Chancellor: (1) Acquitted Robert L. Denman of all unethical conduct; (2) Found Dan Massey guilty of certain unethical conduct and reprimanded him; (3) Found Steven C. Stone guilty of interfering with complainants in an effort to interview a witness in the case on trial and reprimanded him; and (4) Entered no decree against Ralph Gunn.

To review that decree, complainants appealed to this Court. Defendants did not appeal.

The law which governs the issues made by the pleadings is settled beyond controversy in this jurisdiction: (1) By statute, Tennessee Code Sections 9974 and 9975; (2) by the Canons of Professional and Judicial Ethics of the American Bar Association, Appendix, 29 Tenn. App.

839, Rule 38 of the Supreme Court and Rule 31 of the Court of Appeals; and by judicial decision of this court, Schoolfield v. Bean, 26 Tenn. App. 30, 167 S. W. (2d) 359; Memphis & Shelby County Bar Association v. Aspero, 35 Tenn. App. 9, 242 S. W. (2d) 319.

Code Section 9974 provides:

"Any attorney, solicitor or counselor at law admitted to practice in the courts of the state may be disbarred or suspended from the practice of law —

\* \* \* \* \* \*

"(2) Who shall seek out any person having a claim for personal injury, or having any other ground of action, in order to obtain employment by such claimant, or shall employ agents or runners for like purposes, or pay or reward directly or indirectly, those who bring, or influence the bringing, of such cases to him or his office.

\* \* \* \* \* \*

"(5) Who shall be guilty of any unprofessional conduct, dishonesty, malpractice, or any conduct which renders him unfit to be a member of the bar."

Code Section 9975 provides:

"Punishment. — In cases arising under the first subdivision of the preceding section, the judgment of the court must be that the name of the attorney shall be stricken from the roll of attorneys, solicitors and counselors, and that he be excluded from practicing as such attorney or counselor in all the courts of this state; and, upon conviction, in cases under other subdivisions of the preceding section, the judgment shall be permanent or temporary deprivation of the right to practice law, or a censure or reprimand, according to the gravity of the offense."

The Canons of Professional Ethics provides:

Section 27. "It is unprofessional to solicit professional employment by circulars, advertisements, through touters or by personal communications or interviewers not warranted by personal relations. Indirect advertisements for professional employment such as furnishing or inspiring newspaper comments, or procuring his photograph to be published in connection with causes in which the lawyer has been or is engaged or concerning the manner of their conduct, the magnitude of the interest involved, the importance of the lawyer's position, and all other like self-laudation, offend the traditions and lower the tone of our profession and are reprehensible; but the customary use of simple professional cards is not improper."

Section 28. "It is unprofessional for a lawyer to volunteer advice to bring a lawsuit, except in rare cases where ties of blood, relationship or trust make it his duty to do so. Stirring up strife and litigation is not only unprofessional, but it is indictable at common law. It is disreputable to hunt up defects in titles or other causes of action and inform thereof in order to be employed to bring suit or collect judgment, or to breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attaches or others who may succeed, under the guise of giving

disinterested friendly advice in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. A duty to the public and to the profession devolves upon every member of the Bar having knowledge of such practices upon the part of any practitioner immediately to inform thereof, to the end that the offender may be disbarred.''

Section 29. ''Lawyers should expose without fear or favor before the proper tribunals corrupt or dishonest conduct in the profession, and should accept without hesitation employment against a member of the Bar who has wronged his client. The counsel upon the trial of a cause in which perjury has been committed owe it to the profession and to the public to bring the matter to the knowledge of the prosecuting authorities. The lawyer should aid in guarding the Bar against the admission to the profession of candidates unfit or unqualified because deficient in either moral character or education. He should strive at all times to uphold the honor and to maintain the dignity of the profession and to improve not only the law but the administration of justice.''

Section 39. ''A lawyer may properly interview any witness or prospective witness for the opposing side in any civil or criminal action without the consent of opposing counsel or party. In doing so, however, he should scrupulously avoid any suggestion calculated to induce the witness to suppress or deviate from the truth, or in any degree to affect his free and untrammeled conduct when appearing at the trial or on the witness stand.''

In Schoolfield v. Bean, 26 Tenn. App. 30, 167 S. W. (2d) 359, 369, this court held:

"We therefore hold that we have the right to review the action of the trial court to determine whether he exercised a reasonable discretion, or whether he abused his discretion, in suspending the defendants from the right to practice law for one year."

█ In Memphis & Shelby County Bar Association v. Aspero, 35 Tenn. App. 9, 242 S. W. (2d) 319, 330, this rule is stated:

"The Chancellor, after finding the respondent guilty of this charge, fixed her punishment at a reprimand. The case is being tried in this Court de novo, and it is our duty to review, not only the findings of fact, but also the punishment imposed, since, if the Chancellor abused his discretion with regard to punishment, it is our duty to impose such punishment as should have been imposed below."

We shall apply these rules to the facts shown by the evidence in disposing of the questions made by the assignments of error.

The preponderance of the evidence clearly sustains the findings of the Chancellor wherein he held that Robert L. Denman, Dan Massey, and Steven C. Stone were not guilty of certain unethical practices charged in the bill, and we concur in such conclusions of fact.

█ The evidence does not justify a decree of disbarment, reprimand, or censure of Robert L. Denman. The Chancellor correctly acquitted him of all charges of wrong-doing.

The chancellor disposed of the charges against defendant Ralph Gunn in these words:

"It does not appear that this defendant rendered any material assistance in the practice of law. I feel, therefore, that the only additional advice is that he

be admonished to stick more closely to the Bible and pulpit in a continued effort to improve humanity."

The final decree provides:

"The court does not find it necessary to make any order concerning Ralph Gunn, who was absent during most of the trial."

Relating to Dan Massey the final decree states:

"The court is of the opinion and so finds that the greater weight of the evidence shows that Dan Massey has violated the Canons of Professional Ethics and law as charged in the petitions in his conduct in the Fawbush case, in his treatment of a witness in the Penny case, in his admitted conduct in the Burleson case, in his conduct at the viaduct and in the treatment of liability insurance companies and their investigators.

"In view of the number of charges made and the voluntary failure of the plaintiff to introduce any proof concerning about one-half of them, the testimony of the character witnesses and other circumstances, I deem a reprimand and censure as provided by law sufficient punishment. It is therefore, ordered, adjudged and decreed by the Court that the said Massey be and is now reprimanded as provided by law."

In regard to Steven C. Stone, the final decree provides:

"In view of the fact that Steven C. Stone was a member of the firm only a short time and other facts connected with the case, the Court acquits him of all charges in the petition except his conduct at the viaduct connected with the Thomas witness for which conduct the Court now reprimands him as provided by law."

Wherefore, there are two controlling questions before this court:

(1) Did the trial court abuse his discretion in fixing the punishment of Dan Massey at a reprimand in view of the finding of that court that Dan Massey had violated the Canons of Professional Ethics as stated above; or should the punishment have been more severe?

(2) Did the trial court abuse his discretion in fixing the punishment of Steven C. Stone at a reprimand in view of the finding of that court that Steven C. Stone had violated the Canons of Professional Ethics, as stated above; or should his punishment have been more severe?

Since Dan Massey and Steven C. Stone did not appeal from the findings of fact by the Chancellor, we shall accept those facts as true. It is necessary for us to review the evidence upon which the Chancellor based his conclusions of fact in the cases wherein he found them guilty of unethical conduct in order to determine whether he abused his discretion in adjudging punishment fixed in the decree. Then there are other circumstances, some of which are mentioned in the decree, that we must consider in reviewing the question of punishment. We might state that we have taken extra precaution to examine and review this entire record because of the case.

We shall first dispose of the case of Dan Massey.

Bobby Fawbush, a young son of Warren Fawbush, was accidentally killed by coming into contact with an electric wire. The body of the child was taken to Kentucky by his father for burial. While Warren Fawbush was gone to Kentucky on this unfortunate mission, Dan Massey was called by Milton Williams to meet Claude Williams, a brother of Milton Williams, at the store of J. W. Phillips. This store is located in the community where the

Fawbush family lived and where Bobby Fawbush was killed. Claude Williams had some legal matters which he wanted to discuss with Mr. Massey. This legal business of Claude Williams had no connection with the death of Bobby Fawbush. Pursuant to this call from Mr. Williams, Dan Massey went to the Phillips store. While he was discussing the legal matters with the Williams boys, J. H. Fawbush, grandfather of Bobby Fawbush, came into the store and began discussing the death of his grandson with Mr. Phillips, the owner of the store. Mr. Phillips told Mr. Fawbush that Mr. Massey was a lawyer who was there in the store at the time. Whereupon, J. H. Fawbush spoke to Mr. Massey about the death of his grandson. At the suggestion of Mr. Massey, they went to the scene of the accident near-by and looked over the situation.

Mr. Massey sought authority from J. H. Fawbush to proceed with the case as an Attorney. This authority was refused by J. H. Fawbush who stated that his son, Warren Fawbush, father of Bobby Fawbush, would employ the lawyer. When Warren Fawbush returned from Kentucky Mr. Massey promptly contacted him about the case. Mr. Massey was employed in the case and settled it. We do not think the conversation between Dan Massey and J. H. Fawbush justified the aggressive attitude of Dan Massey thereafter in attempting to secure employment in the case. He pushed his casual contact with J. H. Fawbush too far when he evidently kept in touch with the situation and went to the home of Warren Fawbush immediately upon his return from Kentucky.

The Chancellor found that Dan Massey was guilty of unprofessional conduct, "in his treatment of a witness in the Penney case."

■ Miss Norma Penney testified that she personally called Mr. Dan Massey to represent her after she had been injured in an automobile accident and that he did not solicit the case. Miss Ruth Johnson, a friend of Norma Penney, took a great deal of interest in the Norma Penney case. Her testimony conflicts with that of Norma Penney herself. Miss Johnson and Mr. Massey met at the Home Plate Restaurant in Chattanooga where they had a bitter argument. She slapped him and he slapped her, knocking off her glasses and breaking them. It was his theory that she was meddling in his business and was attempting to injure him by making false statements relating to his connection with the Norma Penney case. If that were true, it was improper for him to engage in this quarrel and personal difficulty with Miss Johnson, who was a witness in the case. If she had mistreated him, he had his remedy against her in the courts. A lawyer, above all persons, should not attempt to personally discipline a witness who appears, or will soon appear, against him personally or on the opposite side of a case where he appears as an Attorney. It will be noted that the Chancellor found in favor of Mr. Massey on the charge of soliciting the Norma Penney case; but found against him in regard to his treatment of this witness, Miss Ruth Johnson.

Mr. and Mrs. Arley Burleson were injured in an automobile accident and were carried to Newell Sanitarium in Chattanooga in an ambulance of R. J. Coulter Undertaking Company of Chattanooga. James G. Williamson, a partner in this funeral home, was the driver of the ambulance. Dan Massey and Steven C. Stone were Attorneys for this funeral home. Mr. Williamson, at the request of Mr. Burleson, attempted to call Steven C. Stone to come to the hospital to talk with Mr. Burleson about

the accident. Failing to reach Mr. Stone in two attempts, Mr. Williamson called Mr. Massey. These Attorneys were called because they were the Attorneys for the funeral home. Mr. Burleson seemed unwilling to employ an Attorney; whereupon, Dan Massey suggested that he investigate the wreck with no obligation on the part of Mr. Burleson to employ him as his Attorney. This was going too far. It was natural for Mr. Williamson to call the Attorneys who represented them. It was wrong for Mr. Massey to push his own cause as he did.

Finally, the Chancellor found Dan Massey guilty of unethical conduct, "at the viaduct and in the treatment of liability insurance companies and their investigators."

There was a tug of war between complainants and defendants over the testimony of a witness named Thomas. The witness had given a statement to Maynard Hill and Felix Cox, representatives of insurance companies, who had been engaged by complainants to work up evidence against defendants. Mr. Thomas, under oath, had repudiated this statement and had exonerated Mr. Massey. In an effort to have this witness again change his statement and testify against Dan Massey, Keith Harber, a member of the Grievance Committee, and Maynard Hill again called on Raymond Thomas. Mr. Thomas was friendly to Mr. Massey, so he called Mr. Massey and requested him to come to the viaduct where Mr. Thomas worked and be present when he had his interview with Mr. Harber and Mr. Hill.

Mr. Harber and Mr. Hill had a right to talk to this witness. On the other hand, the witness had the right to have his Attorneys present when he was interviewed by Mr. Harber and Mr. Hill, if he so desired; and he did so desire. Mr. Massey responded to the call from Mr.

Thomas and went to the viaduct, taking Mr. Stone with him.

The attitude of Mr. Massey and Mr. Stone on this occasion was ugly, belligerent, and abusive toward Mr. Hill and Mr. Harber.

They had no right to threaten Mr. Harber and Mr. Hill about this matter. If Attorneys were compelled to meet a situation of this kind when interviewing witnesses on all occasions the orderly trial of cases and the development of facts would be greatly hampered. On the other hand, there are extenuating circumstances in regard to this incident on the side of Mr. Massey and Mr. Stone. The inference is rather clear that Mr. Harber and Mr. Hill were putting undue pressure on this witness to change his statement and to testify adversely to Mr. Massey; or, at least, the witness seemed to think so. The witness took the side of Mr. Massey and Mr. Stone in the controversy and thought they were right and the other parties were wrong.

Only one charge was found against Mr. Stone in the decree of the Chancellor: "His conduct at the viaduct connected with the Thomas witness." Mr. Stone and Mr. Massey were similarly situated in regard to this viaduct affair; except Mr. Thomas called Mr. Massey, and Mr. Stone went along at Mr. Massey's request. For better or for worse, they jointly participated in this incident. It turned out to be an unseemly affair which reflected no credit on either of them.

The following circumstances are considered by this Court in reviewing the decree of the Chancellor fixing the punishment of Mr. Massey and Mr. Stone upon the finding of unethical conduct by the Chancellor:

1. Special investigators, who were employed by insurance companies and their salaries paid by such com-

panies, were engaged by the Grievance Committee to interview the clients of Denman, Massey, and Stone, and to secure statements, where possible, from these clients and former clients which would reflect adversely upon the professional conduct of defendants. The exact number of such clients of defendants who were interviewed by these trained insurance investigators is not shown. It is fairly inferable that the number was large, possibly into the hundreds.

These investigators were not impartial in their work. Their interests and sympathies were on the side of defendants in damage suits where insurance was involved; and there their treasure lay. It is easy for this Court to see how such investigators could find disgruntled clients of any lawyer, and fanning the flame, could secure adverse statements. Very seldom does any claimant in a damage suit recover by trial or settlement an amount which will fully satisfy him. In such case, a specialist in that field can convince the client that his lawyer has been unethical in his conduct and has not properly represented the client. But, upon a full explanation to the litigant, presenting both sides of the matter, the client may reach the conclusion that there was no misconduct on the part of his lawyer after all.

The case on trial clearly supports this view. With only a few exceptions, considering the number of clients interviewed by these investigators, these clients of Denman, Massey, and Stone repudiated the statements which were secured by these insurance investigators and stated that they were fraudulently procured.

The situation was entirely different where members of the Grievance Committee made the investigation. They were brother members of the Bar with defendants and had no personal interest in the matter. However, the

proof shows that practically all of the investigations, originally at least, were made by these insurance investigators. It would have been better had the members of the Grievance Committee—outstanding, capable, ethical young lawyers that they were—had made all the investigations personally. Surely, this should have been true before suit was brought to disbar defendants. It is true, as stated by the Chancellor, that insurance companies have a right to investigate and know of any unethical conduct on the part of defendants. The same would hold true about banks, manufacturing concerns, railroad companies, private individuals, or any other corporations or individuals. We think it very doubtful, however, whether a Bar Association could rely with a proper degree of accuracy upon statements secured by investigators or detectives who were in the employ of a certain corporation or a class of corporations whose interests were directly in conflict with the interests of the clients represented by the lawyers under investigation. Such investigations should be made impartially and with a view of ascertaining the truth and not with the view of building up a case against the defendants.

2. The members of the Grievance Committee, contrary to the usual custom and possibly a rule of the Bar, made these serious and grievous charges against defendants in their bill in this cause, with wide publicity of the press, without first calling defendants before the Committee and giving them a chance to explain.

Upon a more careful investigation, many of these solemn charges in the bill under oath, "on information," were abandoned. The unfavorable publicity of these abandoned charges was rather severe punishment which should not have been inflicted upon defendant. To make indiscriminate charges against a brother lawyer, which

ordinary diligence by investigation would have shown could not be supported by any proof is a wrong against defendants which is difficult to correct. Some people will believe a charge when made even though it cannot be supported by any testimony. Not a word of proof was introduced to support more than one-half of the charges against defendants. This case cannot be pitched upon the same plane as a civil suit involving property rights. Although a disbarment suit is a civil suit, it partakes, also, of the nature of a criminal action, because it is based upon alleged misconduct of the defendants.

Of course, we mean no reflection upon the distinguished members of the Tennessee Bar who represented complainants in this cause under an appointment by the Supreme Court. For them we have the highest regard personally and professionally. Of necessity, they took the facts which were given to them and did not and could not personally investigate the facts. The time element would prevent their making a personal investigation of the hundreds of cases wherein defendants represented the plaintiffs in damage suits.

3. Mr. Massey and Mr. Stone introduced many witnesses, including members of the judiciary of Chattanooga, who testified to their good character.

4. Cases of this sort are often fraught with bitterness and strong feeling. We have not reviewed any record where the trial judge more perfectly directed the proceedings before him. His knowledge and interpretation of the principles of law applicable to the case were not seriously questioned by the Solicitors for complainants or defendants. The Chancellor was uniformly patient and considerate of the lawyers, litigants, and witnesses. Opportunity was given the parties to fully develop the theories. His excellent judicial demeanor was reflected in the

attitude of the lawyers who represented complainants and defendants towards the Court, each other, opposing litigants, and witnesses.

■ The opinion of the Chancellor showed a careful, detailed study and discussion of the entire record before him and the determinative issues made by the pleadings. The preponderance of the evidence supports the conclusions of fact reached by the Chancellor. His decree meets the ends of justice. Certainly, it cannot be successfully said that he abused his discretion in decreeing a reprimand of Dan Massey and Steven C. Stone instead of a more severe punishment. The decree of the Chancery Court is in all things affirmed. Let the judgment of this Court so provide.

The costs in the Chancery Court will stand as adjudged by the Chancellor. The costs of the appeal will be taxed against appellants.

Felts and Howell, JJ., concur.