74 So.2d 221 (1954)
STATE ex rel. FLORIDA BAR
v.
MURRELL.
Supreme Court of Florida. En Banc.
July 30, 1954.
William D. Barfield, Jacksonville, John T. Wigginton, Tallahassee, and Darrey A. Davis, Miami Beach, for complainant.
L.J. Cushman, Miami, for respondent.
TERRELL, Justice.
This is a disciplinary proceeding against Will O. Murrell, Sr., for unprofessional conduct, the charge being that during the years 1946 to 1950 inclusive he did personally or by his touter or runner solicit professional employment, contrary to the Code of Ethics governing members of the Bar. Motions to dismiss and for summary judgment were overruled, other proceedings followed which we do not detail, a referee was appointed who took testimony, heard arguments of counsel and has made report of his findings and recommendations to the Board of Governors of the Florida Bar.
*222 The complaint against respondent was initiated under Section 1, Article XI, Integration Rule of the Florida Bar, 31 F.S.A. and was based on nine cases in which he was charged with soliciting professional employment, two of which the referee found the proof to be insufficient and rejected. A third case was controverted but we pretermit any consideration of that. The referee found respondent guilty of soliciting professional employment as charged in paragraphs 4(a) to 4(g) inclusive of the complaint contrary to Section (1), paragraph 27, and Section (2), paragraphs 19 and 20, of Rule B of the Code of Ethics, approved by the Supreme Court of Florida, January 27, 1941, 31 F.S.A. The referee also found the following mitigating circumstances to favor respondent: (1) He has practiced law in Florida for many years, is 55 years old and a graduate of one of our best A grade Law Schools, is ill and subject to cardiac attacks and is no doubt near the end of his career as a practitioner; (2) He has a young son just getting started in the law practice, and there is no showing of unprofessional conduct since May 1950 which, under paragraph 11, Article XI, Integration Rule, would entitle him (respondent) to apply for reinstatement; (3) Such discipline as may be imposed should take into account that it in no way condones the activities of respondent's adversaries, the Association of Casualty and Surety Companies "who instituted and carried out the investigation, resulting in the charges against respondent." The referee recommends that respondent be suspended from the practice of law for a period of not less than six months nor more than twelve months. The Board of Governors of the Florida Bar, on consideration of the report, the record and recommendation of the referee, heard argument of counsel for respondent, approved the findings of fact of the referee, but recommends that an order be entered by this Court disbarring respondent from the practice of law in the State of Florida. The record, the report and recommendation of the referee and the recommendation of the Board of Governors have been certified to this Court.
The question with which we are confronted may be stated as follows: Under the circumstances presented, should respondent be disciplined and, if so, what form should the discipline take?
The primary defense of respondent is directed to the charge that the investigation of his professional conduct was initiated and conducted by the Association of Casualty and Surety Companies and that no member of the bar or other responsible person had any part in it whatever. The referee conceded this but pointed out that the evidence adduced by said Casualty Companies was received in proffer only, that he ruled it to be immaterial under the issues raised and hence inadmissible. He also ruled that the manner of conducting the investigation and the motive which initiated it were of no consequence as applied to the truth or falsity of the charges except insofar as the credibility of the witnesses was affected, in which event the evidence was admitted. The referee condemned the practice of soliciting or permitting organizations like the Association of Casualty and Surety Companies to investigate the conduct of attorneys under charge of unprofessional conduct because their interests and that of the attorneys in negligence and compensation cases is antagonistic and bound to create widespread resentment among members of the bar and the public. Said the referee: "The bar should conduct its own investigations, and the energy at the disposal of the Association of Casualty and Surety Companies might better be utilized in perfecting a code of ethics for insurance adjusters and in enforcing it, in as much as it is a matter of common knowledge that activities of certain adjusters tend to breed the sort of unprofessional conduct alleged in the complaint filed in this matter", such practice was condemned in Schoolfield v. Bean, 26 Tenn. App. 30, 167 S.W.2d 359 and State ex rel. Turner v. Denman, 36 Tenn. App. 613, 259 S.W.2d 891.
The main witness in support of the charges against respondent was A.M. Crabtree, Sr., who testified that he solicited representation for respondent in all the cases *223 enumerated in the complaint except the case of Palmer. There was effort to impeach Crabtree's testimony but it was corroborated by the testimony of his son, a member of the bar, the testimony of other witnesses, bank accounts of respondent and photostatic copies of pay checks introduced as exhibits. Crabtree further testified as to compensation paid him for soliciting professional services and supported his testimony with photostatic copies of checks made to him for the service. His evidence on this point was challenged but its credibility was for the referee.
Discipline of an attorney may be effected by disbarment, suspension or censure, sometimes called reprimand, which may be public or private. By some well-reasoned cases the test for disbarment is conduct involving moral turpitude. The best treatise on the subject of discipline is found in the book entitled, "Legal Ethics", authored by Hon. Henry S. Drinker of the Philadelphia Bar, Chairman of the Standing Committee on Professional Ethics and Grievances, American Bar Association. There are also many well written opinions treating the subject. Both Mr. Drinker and the Courts tell us that disbarment is the extreme measure of discipline and should be resorted to only in cases where the lawyer demonstrates an attitude or course of conduct wholly inconsistent with approved professional standards. It must be clear that he is one who should never be at the bar, otherwise suspension is preferable. For isolated acts, censure, public or private, is more appropriate. Only for such single offenses as embezzlement, bribery of a juror or court official and the like should suspension or disbarment be imposed, and even as to these the lawyer should be given the benefit of every doubt, particularly where he has a professional reputation and record free from offenses like that charged against him.
Speaking to this point, in Bradley v. Fisher, 13 Wall. 335, 80 U.S. 335, 20 L.Ed. 646, the Court said: "To deprive one of an office of this character would often be to decree poverty to himself and destitution to his family." A removal from the bar should therefore never be decreed where any punishment less severe, such as reprimand, temporary suspension or fine, would accomplish the end desired. The following cases enlighten the question. In re Power, 407 Ill. 525, 96 N.E.2d 460; In re Diesen, 173 Minn. 297, 215 N.W. 427, 217 N.W. 356; In re McDonald, 204 Minn. 61, 62, 282 N.W. 677, 284 N.W. 888; Barton v. State Bar of California, 209 Cal. 677, 289 P. 818; In re L.R., 7 N.J. 390, 81 A.2d 725; In re Gill, 104 Wash. 160, 176 P. 11 and In re Bruener, 178 Wash. 165, 34 P.2d 437; United States v. Costen, C.C., 38 F. 24; People ex rel. v. McCallum, 341 Ill. 578, 173 N.E. 827; Dorsey v. Kingland, 84 U.S. App.D.C. 264, 173 F.2d 405; In re Isserman, 9 N.J. 269, 87 A.2d 903. The last cited opinion was by Chief Justice Vanderbilt and is interesting because of the circumstances out of which it derived and the ground for disbarment, but all these citations deal with professional lapses and attitudes that on their face should not be indulged in by any respectable lawyer. They are important because they give us the approach of the best legal thinking in the country on the question of discipline for unprofessional conduct.
It is well settled that the legislature may impose minimum character and scholastic requirements as a prerequisite for admission to the bar, but the decisions generally hold that when it comes to establishing and upholding the highest standards of professional conduct and protecting the public from the unscrupulous practitioner, that duty rests upon the courts. Ex parte Steckler, 179 La. 410, 154 So. 41; In re Lavine, 2 Cal.2d 324, 41 P.2d 161, 42 P.2d 311; Hanson v. Grattan, 84 Kan. 843, 115 P. 646, 34 L.R.A.,N.S., 240; In re Platz, 42 Utah 439, 132 P. 390; In re Opinion of Justices, 279 Mass. 607, 181 N.E. 833, 82 A.L.R. 1021; In re Cannon, 206 Wis. 374, 240 N.W. 441; Rheb v. Bar Association of Baltimore, 186 Md. 200, 46 A.2d 289; State v. Peck, 88 Conn. 447, 91 A. 274, L.R.A. 1915A, 663; In re Bergeron, 220 Mass. 472, 107 N.E. 1007, Opinion by Chief Justice Rugg. It is an enlightening discussion *224 of the reasons for imposing scholastic qualifications on members of the bar. Mr. Drinker's book treats the question of discipline for unprofessional conduct in two categories: (1) Cases in which the lawyer's conduct has shown him to be one who cannot properly be trusted to advise and act for clients. (2) Cases in which his conduct had been such that to permit him to remain a member of the profession and to appear in court, would cast a serious reflection on the dignity of the court and on the reputation of the profession. The decisions amply support this division.
In this country there are reasons for exacting a high standard of professional conduct on the part of members of the bar that may not prevail in other countries. Some of these reasons are embraced in the canons of ethics, American Bar Association, the preamble to which points out that "In America where the stability of courts and all departments of government rests upon the approval of the people, it is peculiarly essential that the system for establishing and dispensing justice be maintained so that the public shall have absolute confidence in the integrity and impartiality of its administration. It cannot be done unless the conduct and motives of our profession are such as to merit the approval of all just men." Other Canons are embraced in the Code adopted by this Court, January 27, 1941.
The Canons are published in 145 Fla. at page 783, and should be read by every lawyer as often as his preacher reads the Bible. They were not intended to be more than a general guide. Changing circumstances and conditions require constant addition, modification and clarification. Study of the Canons is not an option, it is a must, and deserves a much more important place in the Law School curriculum than has heretofore been accorded it. The lawyer is an officer and right arm of the court in the administration of justice, he has the major responsibility for making and administering the law of the nation, the State, the county and lesser governmental entities. He is the trustee of his client and is expected to execute that trust in obedience to the Canons of the profession, the constitution of his State and the United States. His relation to his client is fiduciary and his integrity should be of that discriminating quality that he readily distinguishes where his duty to client and his duty to country clash; and if it does, he will be led by the higher duty to country. There is a limit to the lawyer's obligation to his client. See Canons 15, 18, 31 and 32, American Bar Association, or Canons bearing same number in 145 Fla. In addition to these duties, some of which are public and some professional, there is no end to the calls that a lawyer will have to serve in his local community and its institutions. Some of these will be remunerative and many will be gratis, but in either event the dignity of his profession, his integrity as a lawyer and his honor as a citizen require that he serve with candor, fidelity and sincerity. There is in fact, no vocation in life where moral character counts for so much or where it is subjected to more crucial tests by citizen and the public than is that of members of the bar. His client's life, liberty, property, reputation, the future of his family, in fact all that is closest to him are often in his lawyer's keeping. The fidelity and candor with which he performs his trust, point up reasons that distinguish the legal profession from other businesses. Every lawyer who fails to withstand the test will subject the profession to merited criticism. Not only that, he will be likened to the proverbial rotten apple that taints the other apples in the barrel. See Sharswood's Professional Ethics; Cases on the Legal Profession and its Ethics, Costigan; Cases and Materials on the Legal Profession, Cheatham; Organization and Ethics of the Bench and Bar, Hicks.
So much for the perspective from which we determine the case at hand. Respondent was found guilty of soliciting professional services on seven counts. He contends that the findings of fact of the referee are contrary to law and the evidence, he levels no direct assault on the counts as to which the referee found him guilty. He relies on the testimony of the Association of *225 Casualty and Surety Companies to support his contention but the referee rejected that and held other evidence sufficient to support the charges. In this we think the referee was correct, and being so, respondent is relegated to the defense or contention that the punishment proposed by either the referee or the Board of Governors is too severe; in fact, such was the burden of respondent's argument before this Court.
The ban against soliciting professional services by lawyers, either by advertising or by touter, had its origin early in the traditions of the English Bar. In Chapter eight of his treatise on the subject, Mr. Drinker points out that the young men who came early to the Inns of Court to prepare for the bar were sons of well-to-do families who did not have to worry about their bread and butter, they had no truck with trade or the competitive spirit, they regarded the law in the same way they did a seat in parliament, a form of public service in which gaining a livelihood was a mere incident. Hence the legal profession acquired a traditional dignity that leaders of the bar have since striven to preserve. The conditions under which the lawyer practices his profession in England contributed materially to this. They lived together at the Inns of Court and met each other daily as a select fraternity. These amenities were brought to this country by the young men who went to the Inns of Court during the Colonial period to prepare for the bar. They returned and became the leaders of the bar in this country. While we practice law under very different circumstances, these early amenities became rules of professional conduct and persist because lawyers are members of a profession with a cherished tradition, the preservation of which is essential to reverence for their calling.
Rule B, Code of Ethics, stems from Canon 27, American Bar Association, Canons of Professional Ethics. When first adopted it contained the following pertinent statement: The most worthy and effective advertisement possible, even for a young lawyer, and especially with his brother lawyers, is the establishment of a well merited reputation for professional capacity and fidelity to trust. This cannot be forced but must be the outcome of character and conduct. Says the American Bar Association in its first published opinion: "Any conduct that tends to commercialize or bring bargain-counter methods into the practice of law, lowers the profession in public confidence and lessens its ability to render efficiently that high character of service to which the members of the profession are called." In In re Farmer, 191 N.C. 235, 131 S.E. 661, 663, Chief Justice Stacy epitomized the essential quality of an upright lawyer to be that which "expresses itself, not in negatives nor in following the line of least resistance, but quite often in the will to do the unpleasant thing if it is right, and the resolve not to do the pleasant thing if it is wrong."
In Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 572, 79 L.Ed. 1086, Chief Justice Hughes pointed out that the "community is concerned in providing safeguards not only against deception, but against practices which would tend to demoralize the profession by forcing its members into an unseemly rivalry which would enlarge the opportunities of the least scrupulous. What is generally called the `ethics' of the profession is but the concensus of expert opinion as to the necessity of such standards." In his book, "The Law a Business or a Profession", Julius Henry Cohen enlarges on this theory and discusses at length the unselfish devotion of disinterested loyalty required of the lawyer to his client's interests. The lawyer should not require a guide to distinguish good and bad, neither can he separate the law from morality. In a democracy like ours the public has a right to expect that the conduct of the Bar will be in keeping with an exacting code of decency, a code that will screen out the amoral and the immoral.
By traditional American standards we judge people by the integrity of their character. Character is not a pliable substance like putty that may be made to give any place or any time that pressure is applied. Character is spiritual and rigid, it guides *226 one's conduct by set moral values and no external immoral or amoral influence can veer his course from approved ethical standards. Integrity of character is the first prerequisite to dependability, to constancy of purpose, no single racial or economic group has a corner on it, it is found among the lowly as often as it is among the well-born. When a client has a real job to do it looks for the lawyer with character. No client worth having wants a lawyer without it, he is unstable, he is short on know-how, he will not stay put and he sometimes fails to distinguish the difference between his and his client's money.
In this pronouncement we do not overlook the contention that the practice of law is a competitive business controlled by standards not materially different from those which control other competitive businesses. If that were true, then all we have said about the law being a great profession, that the primary function of the lawyer is that of officer of the court for the administration of justice, that his relation to client is highly fiduciary and that his relation to the court and his brethren at the bar must be characterized by such candor and rectitude of conduct as to preclude him from advertising or appropriating other methods common to commercial ventures to attract clients,  all this would amount to nothing more than empty trade talk. However, this is not true and while there are differences that distinguish those who administer justice from those who sell goods, the canons clearly point out these differences. The law is not a business,  it is a profession, a noble one, with standards in certain respects different from those applicable to business, which standards it is the duty of the bar to uphold. One such difference is the propriety of advertising and soliciting employment. Although a businessman may, within the code of law and decency, puff and advertise his product and actively solicit its purchase, the bar has always condemned such conduct by lawyers. If the high standards of the bar are to be maintained, the courts must be assiduous to give to the bar their full support in this endeavor.
One who is so imbued with the competitive spirit that he must advertise and solicit business should sell automobiles, real estate, drygoods, groceries, refrigerators and radios, rent a hole in the wall and sell victuals, make the best pies, fry the best chicken and steak, be an outstanding golfer, football player, propagate the best strain of seed corn or breed a stud horse that will outrun any other stud horse in the country and win a Kentucky Derby, any of which and many others may be advertised to the heart's content and will make the owner a fortune, but if he is expert in the administration of justice he is governed by canons that place the emphasis on spiritual consideration, he is the fiduciary of his client, the state and the public, he must be candid with the court, fair and considerate of other lawyers and have a reputation for the highest integrity. When the state admits a lawyer to practice, it places its stamp of approval on him and says he is worthy to be trusted in legal matters. Advertising and deception are not included in his lexicon.
So much for the inhibition against soliciting professional services. While disciplinary proceedings are neither civil nor criminal and are not governed by technical rules of procedure, the Integration Rule requires a complaint and that in other respects investigation of the charges be orderly. The referee pointed out some mitigating circumstances which we do not discuss. His finding that respondent desisted from and has not solicited professional employment since charges were preferred against him in April or May 1950, approximately four years ago, is challenged by the complainant. It is true, that no client has testified against or made any charge of fraud or double dealing against respondent. The referee was not only fair but correct in the treatment of the evidence submitted by the Casualty and Indemnity Companies, but much heat was near the surface and it is difficult to tell just how much this evidence colored the proceedings. It is perfectly evident that these companies were out to make a case against respondent and should not have been permitted such a *227 prominent part in directing the trial. Such evidence was condemned in State ex rel. Turner v. Denman, 36 Tenn. App. 613, 259 S.W.2d 891.
There is no suggestion that respondent misappropriated the funds of his client, was guilty of bribery, embezzlement or that his conduct amounted to a wilful and deliberate attack on the administration of justice. It is a fact that he did not frankly admit his delinquency or attempt a plausible explanation, but persisted to the end that the punishment imposed was too severe. At the Institute on Legal Ethics, held at the Law School, University of Florida, recently, one very definite impression received by the writer was that courses in legal ethics were of recent origin and not yet designed to give one a thorough knowledge of the subject. This would not excuse respondent's delinquency but it might be a factor in his lack of sensitiveness to ethical precepts. One cannot read the Canons, the opinions of the American and State Bar Association interpreting them, including Mr. Drinker's treatise, without being convinced that legal ethics should have a much more important place on the law school curriculum than has heretofore been accorded them. There is no other way in which the law student can become sensitive to them.
The charge against respondent cannot be said to be one that is the product of innate baseness or depravity like the embezzlement or misappropriation of funds entrusted to him, showing him to be one who cannot properly be trusted to advise and act for clients. He has, however, in order to further his personal interests by enlarging his practice, deliberately violated the canons of his profession, not merely by one isolated act, but by a persisted course of conduct. There is no showing of penance on his part but on the contrary a showing of persistence until the institution of this case. While he has seriously violated the obligations of his profession, this has not been so flagrant that, provided he does not renew the improper practice, his remaining a member of the profession and his appearance in court will cast a serious reflection on the dignity of the court or the reputation of the profession. Accordingly neither of the two conditions are here present which have been recognized as justifying disbarment.
Complainants insist that respondent should be disbarred and have cited many cases in support of their contention. These cases have been thoroughly examined. Respondent has cited many cases in support of his contention that the punishment proposed is too severe. These cases and many others have been examined. Few, if any, cases coming to this Court have been more thoroughly considered than this one. After all is said, disciplinary proceedings are largely controlled by the facts of the particular case.
The judgment in a case like this must have these factors in mind: (1) it must be just to the public and must be designed to correct any anti-social tendency on the part of respondent as well as deter others who might tend to engage in like violations; (2) it must be fair to respondent at the same time the duty of the court to society is paramount. Respondent was found guilty of soliciting professional services in seven cases. A great many decisions on the point have been examined and in most of them the penalty ran from censure to twelve months' suspension. Measured by the criteria pointed out in these cases and that pointed out in the text of this opinion, the question presented is whether respondent should be disbarred or suspended from the practice of law.
Mr. Chief Justice ROBERTS, Mr. Justice THOMAS, Mr. Justice HOBSON and Mr. Associate Justice DAYTON are of the view that respondent should be suspended from the practice of law for two years unless he shall within 90 days pay the cost of this proceeding, in which event he shall be suspended for a period of one year. The writer of this opinion agrees to the suspension but, like the referee, I think twelve months or even a shorter period of suspension would be more appropriate. *228 There is no showing of moral turpitude. It is shown that in his zeal for business his concept of the amenities went awry.
It follows that respondent be and he is hereby suspended from the practice of law for two years unless he shall within 90 days pay the cost of this proceeding, in which event he shall be suspended for a period of one year.
ROBERTS, C.J., and THOMAS and HOBSON, JJ., and DAYTON, Associate Justice, concur.
SEBRING and DREW, JJ., dissent.
DREW, Justice (dissenting).
I am of the view that the record sustains the recommendations of the Florida Bar, that the respondent should be disbarred and that the costs should be assessed against him.
SEBRING, J., concurring.