194 So.2d 264 (1966)
THE FLORIDA BAR, Complainant,
v.
Reid F. MOORE, Respondent.
No. 35088.
Supreme Court of Florida.
September 28, 1966.
As Corrected on Rehearing November 23, 1966.
Rehearing Denied February 14, 1967.
*265 James E. Weber, West Palm Beach, for The Florida Bar, complainant.
Manley P. Caldwell, Palm Beach, for respondent.
SEBRING, Justice. (Ret.).
The Florida Bar instituted a disciplinary proceeding against the respondent, Reid F. Moore, an active member of the Florida Bar, charging that he had been guilty, in specified particulars, of unethical conduct as an attorney. To the complaint, the respondent filed an extensive answer denying that he was guilty as charged. A referee appointed to conduct a hearing on the issue concluded, after he had received more than 700 pages of testimony and numerous exhibits, that the charge had been proved and that the respondent should be suspended for a three months' period and until he had made certain specified restitution. Upon review of the record in the case, the Board of Governors of the Florida Bar approved the findings of the referee but refused to follow his recommendations, and entered a judgment of disbarment instead. The present hearing before this Court is on a petition to review the record and to set aside the disbarment order. Since the inferences to be drawn from the facts are the matters about which the parties disagree, we think it advisable to set out the facts at length as we find them reported in the record.
On September 17, 1940, Albert Y. Gowen and Marian E. Gowen, his wife, entered into a separation agreement in Massachusetts by which it was agreed that if the wife would forego demands for alimony and property in the event of a divorce between the parties, the husband would establish an inter vivos trust under which the wife as life tenant would receive annual income from certain specified stocks, the husband to pay the income taxes against all income accruing to the life tenant. Pursuant to this agreement the husband established the trust in Massachusetts on September 17, 1940, naming as trustees thereunder the life tenant and two friends of the parties who resided in Massachusetts.
The instrument by which the trust was created provided, among other things, that beginning on the date of a divorce decree between the parties the trustees would pay to Mrs. Gowen, for life, the annual net income from certain stocks, which were listed as: 5200 shares of Alpha Portland Cement Company stock, 305 shares of Consolidated Edison Company of New York, Inc. stock, and 5 shares of Concord National Bank. It further provided that upon the death of Mrs. Gowen, the life tenant, the trustees would deliver the principal of the trust to the settlor, or in the event of his prior death, to such remaindermen as were designated in his last will and testament. The trust instrument also provided, in addition to the power to invest and reinvest the principal, that:
"8. Trustees and their successors, in addition to and not in limitation of all common law and statutory authority, shall have power with regard to both real and personal property in the trust fund and any part thereof * * * to determine what shall be charged or credited to income and what to principal notwithstanding any determination by the courts and specifically, but without limitation, to make such determination in regard to stock and cash dividends, rights and all other receipts in respect of the ownership of stock * * * to purchase or retain stocks which pay dividends in whole or in part otherwise than in cash *266 * * * in its (sic) discretion to treat such dividends in whole or in part as income * * * and generally to do all things in relation to the trust fund which the said Donor could do if this trust had not been executed. All such divisions and decisions made by the Trustees in good faith shall be conclusive on all parties in interest. The Trustees shall receive reasonable compensation for their services * * * which may in the discretion of the Trustees, be paid out of principal,
"9. No trustee hereunder shall be liable save for his own wilful misconduct or default.
"10. Upon the death, resignation or inability to serve of either [of the Massachusetts trustees] another trustee shall be appointed by the remaining trustees by a writing endorsed hereon or annexed hereto. Any successor trustee shall have all the powers, rights and privileges and be subject to all the duties as if originally named trustee hereunder."
Subsequent to the execution of the trust instrument, Mrs. Gowen divorced her husband and, at a later date, married Valentine Ely, a Florida resident. In 1959, while living in Palm Beach, Florida, the Elys retained the respondent to advise them as to Mrs. Ely's rights under the trust instrument and the contemporaneous property settlement agreement, which Albert Y. Gowen had breached by failing to pay income taxes on income receivable by the life tenant.
After studying the files that Mrs. Ely had given him in respect to the trust, the respondent became convinced that under the terms of the trust instrument the trustees had the authority to recover the past due taxes from Gowen, either by a direct suit or by charging the amount against the principal of the trust of which Albert Y. Gowen was then designated "remainderman." He also became convinced that Mrs. Ely was entitled to share in trustees' fees payable from the principal, since she was a co-trustee under the trust instrument. And, after discovering from the files that in 1955 the trustees had received from Alpha Portland Cement Company three shares of stock for each one held by them, which the Massachusetts trustees had allotted to principal, he became convinced that since the trust had been established primarily for the purpose of paying income to the life tenant in lieu of alimony and property claims, the trustees, in the exercise of a sound discretion, should have allocated the 7200 shares of Alpha stock they had received to the life tenant as income, or, in any event, should have allocated to her, as income, 1440 shares of the stock, since these represented a distribution of profits of the corporation.
When he made his legal conclusions known to Mr. and Mrs. Ely, they agreed to pay him as their attorney, one-third of any amount he might recover from the trust for Mrs. Ely's benefit, over and above the annual income of $14,000 to $18,000 she was then receiving. After this agreement had been effected, the respondent prepared a memorandum stating his views, which he sent to the Massachusetts trustees for their consideration and study. At a later date he met with the trustees in Boston to discuss the matter. The upshot of this conference was that, after finding that they could not agree with him, the Massachusetts trustees resigned and asked that other trustees be appointed.
Mr. Ely, the husband of the life tenant was selected as one of the successor trustees. Then he and Mrs. Ely selected as the second successor trustee Walter T. Anderson, a Florida resident, who agreed to serve upon the condition that the trustees would sell the Alpha stock (which constituted the bulk of the assets of the trust) and would diversify the trust holdings. Thereafter, the trust assets, of the approximate value of $550,000, were transferred from Massachusetts to Florida.
After the trust assets were lodged in Florida, the respondent continued to represent *267 Mrs. Ely, as life tenant and also began to advise and represent the trustees in respect to the trust administration. Although he never sent the trustees a bill for services, it is clear that he felt that he was earning a fee, which he intended to work out with them in the future, on some mutually satisfactory basis.
In February, 1959, the trustees sold 2600 shares of Alpha Portland Cement Company stock, and all capital gains realized from the sale, in the amount of $84,663.70, were turned over to Mrs. Ely as income. When she received this amount, Mrs. Ely promptly paid the respondent an amount equal to one-third of the proceeds, in accordance with the fee arrangement that had been made between the respondent and the Elys.
In February, 1960, the trustees sold an additional 4200 shares of Alpha Portland Cement Company stock and all capital gains realized from the sale, in the amount of $127,455, were transferred to Mrs. Ely as income. In pursuance of her contingent fee agreement, Mrs. Ely paid one-third of this amount to the respondent. In 1960, the trustees also sold certain miscellaneous stocks of the trust, with a capital gain of $6,909, and this amount was transferred to Mrs. Ely as income. In due course, Mrs. Ely paid to the respondent one-third of this amount as his fee for recovery.
On December 28, 1960, the trustees transferred the remaining 4080 shares of Alpha stock, of the approximate value of $170,000, directly to Mrs. Ely as income, and she promptly caused one-third of the stock to be transferred to the respondent in payment of his office.
The testimony is to the effect that while all of these transactions were consummated by the trustees in accordance with their own decision, the respondent prepared the necessary papers and advised the trustees that the steps they were taking were perfectly legal. Parenthetically, all of these stock transactions were handled through the Palm Beach office of Hirch and Company, stockbrokers, of which Mr. Ely, the husband of the life tenant, was office manager.
At the hearing before the referee the trustee, Anderson, testified that while the respondent never discussed with him the duties of the trustees of a trust to a remainderman, the trustees assumed that there was probably a remainderman but didn't realize that they owed him any particular duty. When questioned about the motives that impelled the trustees to agree to the stock transfers and sales, Anderson testified that he and Mr. Ely went over the Alpha Portland Cement Company's statements and personally determined that a certain amount of the assets were dividends and were entitled to be distributed as income, if the trustees saw fit to treat them as such. When asked about some legal opinions that he had suggested that the respondent obtained from independent attorneys before the transactions were entered into, Anderson testified that although there was no question in his mind that the trustees could sell the stock and allot the capital gains to income, and that he thought it was just and right to distribute the proceeds in this way, he wanted to be sure because of the extent of the sales and transfers contemplated that the transactions would be legal.
One of the attorneys from whom an opinion was sought was Mr. J.W. Salisbury, an active member of the Florida Bar who practiced in Palm Beach County. He agreed with the respondent's position that since the trustees and the income beneficiary resided in Florida, the trust should be administered in accordance with the laws of Florida, and that under the trust agreement the trustees had the discretionary power to sell the stock and allot the capital gains to the income beneficiary.
Mr. William A. Lord, who practiced in Palm Beach County, was also requested to give an opinion. He testified at the hearing that the respondent showed him the trust agreement, cited the applicable Florida *268 statutes, exhibited a copy of a letter he had written to the trustees advising them of their discretionary power under the trust agreement to determine what should be credited to income and what to principal, and requested him to render an opinion to the effect that the trustees had discretionary power under the trust agreement and the statutes to sell the trust assets and allot the capital gains to the income beneficiary. Mr. Lord rendered such an opinion, but stated later, at the hearing, that if the respondent had given him information about the history of the trust, that the respondent represented the income beneficiary, and that a remainderman was involved, his opinion would have been different from the one given.
Mr. Elwyn Middleton, a practicing attorney in Palm Beach County, was also asked to render an opinion. He testified that the respondent showed him the trust agreement, the applicable Florida statutes, a copy of a letter he had written to the trustees concerning their discretionary powers under the trust agreement, and requested an opinion for the purpose of corroborating his own views in respect to the legality of a sale of the stock and an allocation of the proceeds to income. Mr. Middleton rendered an opinion to the effect that the trustees had the power, in their discretion, to allocate stock dividends, stock splits and stock rights to income and to distribute them to the income beneficiary. When called to testify at the hearing, Mr. Middleton stated that if he had been given the background facts of the case he would not have written the supporting opinion but would have recommended that a suit be filed for a declaratory decree.
The record reveals that in the Fall of 1960, certain attorneys who represented the remainderman called on the respondent to give certain information about the status of the trust and of the amounts the trustees had allocated to income. The respondent agreed to give this information within a period of 30 to 60 days but failed to do so. Thereupon an accounting suit was filed on behalf of the remainderman, in which the Elys and Anderson, individually and as trustees of the Gowen trust, were named as parties defendant. At a later date, on January 31, 1961, the respondent mailed the attorneys a written list showing the securities in the trust as of January 29, 1959 and as of December 30, 1960, together with a statement of income and expenses for the period. On February 20, 1961, he mailed them another written list showing the sale of trust securities during 1959 and 1960, with a resulting net profit of $219,027.91, and that this amount had been allocated by the trustees to income. When asked why he had not given the requested information at an earlier date, the respondent testified that the Elys had instructed him not to disclose this information to the remainderman. The Elys denied that any such instructions had ever been given to the respondent, and the referee apparently saw fit to believe that their testimony was true.
After the filing of the accounting suit, the Elys, upon the recommendation of the respondent, retained an attorney other than the respondent to represent them. This action was recommended, according to the respondent, because he anticipated that he would be called as a witness and that a conflict of interest might arise. The trustee Anderson also retained independent counsel to represent his interests. As the suit progressed, the attorney for the Elys became convinced that he could not successfully defend their activities in connection with the trust and accordingly recommended settlement upon the best terms possible. When the Elys and Anderson agreed to this course of action, settlement was effected and the suit was dismissed with prejudice upon the agreement of the trustees and the life tenant that the trust would be terminated, and upon the agreement of the life tenant to surrender 2400 shares of Alpha Portland Cement Company stock, to relinquish all claims to present or future income and the payment of income taxes thereon, and to pay $82,000 in cash *269 to the remainderman. As to this cash item of $82,000, the record shows that $25,000 of the sum was contributed by the respondent, and that he received from the Elys a general release releasing him from any and all past, present or future claims that they might or could have against him. The remainderman was willing to effect a settlement, according to his attorneys, not because of any doubt about the soundness of the complaint but because the Elys had represented under oath that their combined net worth was less than $200,000, and the remainderman felt that the amount of the agreed settlement would be worth more to him than an unsatisfiable final judgment.
As the outcome of the trial and settlement, the life tenant and her husband not only gave up assets and property rights mentioned above, but became indebted to their attorneys for a $17,500 attorneys' fee, and for certain other amounts not shown in the record. The trustee Anderson became indebted to his attorney for a $2500 fee for services rendered in the suit and settlement which he had to pay out of his own personal assets.
The question before the Court is whether upon these facts an order of disbarment or of some lesser form of discipline is warranted. To determine this point, we turn to the findings of the referee.
The referee found that the respondent had represented and advised both the trustees and the life tenant when a conflict in interest existed; and consequently violated Canon 6 of the Canons of Professional Ethics which provides that "It is unprofessional conduct to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts."
We are of the opinion that a lawyer represents conflicting interests, within the meaning of the Canon, when it becomes his duty, on behalf of one client, to contend for that which his duty to another client would require him to oppose. While it might be argued that up to a certain point in his professional relationships with the life tenant and the trustees of the trust no harmful violation of Canon 6 occurred, we think there can be no question that when the trustees began relying upon the respondent for legal advice as to how the trust could be depleted for the benefit of the life tenant, and the respondent began giving them advice in this regard, a serious question of conflict of interest arose that should have been resolved by the prompt withdrawal by the respondent from the representation of the trustees and by advising the trustees to secure other attorneys to represent them. It is immaterial that in continuing his dual representation, the respondent may have acted with good intentions or that his motives may have been pure. It is settled that, except in exceptional circumstances which are not to be found in this record, an attorney may not represent conflicting interests in the same general transaction, no matter how well-meaning his motive or however slight such adverse interest may be. The rule in this respect is rigid, because it is designed not only to prevent the dishonest practitioner from fraudulent conduct but also to preclude the honest practitioner from putting himself in a position where he may be required to choose between conflicting duties, or be led to an attempt to reconcile conflicting interests, rather than to enforce to their full extent the rights of the interest which he should alone represent. Strong v. International Building, Loan and Investment Union, 183 Ill. 97, 55 N.E. 675, 47 L.R.A. 792.
The referee also found that when the respondent sought legal opinions from outside attorneys to bolster his own advice to the trustees respecting their power to sell the trust assets and allot the proceeds to income, he breached Canon 22 of the Canons of Professional Ethics which declares that "The conduct of the lawyer * * * with other lawyers should be characterized by candor and fairness." We *270 agree with the referee's finding, because there can be little doubt that when the respondent sought advice from Messrs. Lord and Middleton, two trustworthy and respected attorneys in the community, he did so for the purpose of procuring opinions that could be exhibited to the trustees with the implication that these attorneys were in agreement with him that the course he was advising in respect to the sale of the stocks and the allocation of the capital to income was legal and regular in every particular. Under these circumstances we think that simple candor and fairness required the respondent to disclose all the background facts pertaining to the trust, whether they were requested by the attorneys or not, and that when he withheld this information from them he took advantage of the honorable relationship that should and must exist among fellow attorneys.
The referee found that the fees charged the life tenant for services rendered by the respondent were excessive and unwarranted under the circumstances of the case, and that therefore the respondent violated Canon 13 of the Code of Ethics which provides, in part, as follows: "A contract for a contingent fee, where sanctioned by law, should be reasonable under all the circumstances of the case, including the risk and uncertainty of the compensation. * * *" In expressing his views on this point, the referee had this to say: "The referee is of the opinion there was no contingency upon which to base a fee. All that had to be done under respondent's plan was for him to advise the trustees that the stock transactions were legal, * * * to obtain concurring opinions, prepare a paper for the trustees to sign authorizing the sale and paying over the proceeds to the income beneficiary who was represented by respondent, then collect his one-third portion from her. What event could have happened to prevent the completion and accomplishment of the plan? * * * Respondent's one-third fee was always a certainty and based upon no contingency * * *. The referee fails to find that in the plan of respondent any adverse positions or obstacles were contemplated and no challenge presented, as he was seeking results for [the life tenant] which he was in a position to control. Here respondent was wearing two interchangeable hats to be chosen and worn as his dual representations required, and from which he would benefit in the end. Under his advice and guidance the plan could not fail because he was representing the principals on both sides * *."
While we agree with the general finding of the referee that the fee paid to the respondent was excessive under all the circumstances of the case, we are not too sure that we can fully agree with the reason upon which he bottomed his finding. As we view the matter, the point is not whether the contingent fee agreed on by the parties was excessive for services to be rendered but is whether under the terms of the agreement it can be said, in good conscience, that the amount of the fee paid by the life tenant was ever actually earned in full. As should be recalled, the amount to be paid under the contingent fee agreement was to be determined by the amount that the respondent ultimately recovered for the benefit of the life tenant, over and above the $14,000 to $18,000 she was then receiving as annual income. When his activities in her behalf were finally concluded by the settlement in the accounting suit, the ultimate amount recovered for Mrs. Ely fell far short of original anticipations; for not only had she been compelled to return to the trust a considerable portion of her earlier receipts and to pay a large attorney's fee to an attorney other than the respondent, but had been forced to relinquish all claims to future income, as well. As measured by the net sum the respondent actually recovered for the benefit of the life tenant, the attorney's fee received by him, in the sum of $130,000, was grossly excessive.
Finally, the referee found, in substance, that the respondent was derelict in his duty as an attorney when he withheld *271 information from the remainderman concerning the administration of the trust, knowing that the legal advice he was giving the trustees would lead them into a course of action inimical to the interests of the remainderman and would undoubtedly produce litigation between the parties. While there is some support in the record for the finding of the referee in this regard, we think that the finding does little more than point up the dominant mistake of the respondent in attempting to represent conflicting interests. The respondent breached his duty as an attorney when, under the facts of the case, he attempted to represent the interests of the life tenant and the trustees in the administration of a trust as to which there were conflicting interests. Having embarked upon this questionable course, it seems to us that, no matter how sure he was of the soundness of his legal position, common prudence should have led him to advise the trustees that notice be given the remainderman of contemplated transactions that would virtually destroy the corpus of the trust. It appears to us that anything less than this would be negligent conduct, because any lawyer should be held to know that trustees owe duties to remaindermen as well as to life tenants, and should direct his trustees accordingly. If such advice had been given the trustees, or if a suit for declaratory decree had been instituted to determine the respective rights of the parties, the ensuing suit for an accounting could possibly have been avoided.
With these comments behind us we return to the question whether under settled principles of law disbarment or some other form of disciplinary action is warranted under the referee's findings.
According to the authorities, disbarment is the extreme measure of discipline that can be imposed on any lawyer. It should be resorted to only in cases where the person charged has demonstrated an attitude or course of conduct that is wholly inconsistent with approved professional standards. To sustain disbarment there must be a showing that the person charged should never be at the bar. It should never be decreed where punishment less severe, such as reprimand, temporary suspension, or fine will accomplish the desired purpose. State ex rel. Florida Bar v. Murrell, Fla., 74 So.2d 221.
According to the record the respondent is 55 years of age. He received his law degree in 1933 and in that year was admitted to practice law in Tennessee. He was admitted to practice law in Georgia in 1951, Ohio in 1954, and Florida in November 1958, where he has since been practicing. So far as the record shows, the respondent has never been charged with professional or personal misconduct throughout his entire career as a lawyer. As the record makes plain, the Elys were anxious to get everything they could from the trust, and the third trustee, who was a friend of the family, was willing to help them in their efforts. These facts must have been taken into account by the referee in considering the nature of the discipline to be imposed, because with all the witnesses before him he recommended suspension for a three-month period instead of disbarment  and in this we do not think he erred in judgment.
It is therefore the conclusion of this Court that the judgment of disbarment be not approved. In lieu thereof, it is the conclusion of this Court that the respondent, Reid F. Moore, should be and he is hereby suspended from the practice of law for a period of three months and continuously thereafter until he has made full restitution to Mrs. Marian Ely for the sums of money paid or promised to be paid by her for legal services rendered by her attorneys in connection with the defense and settlement of the accounting suit brought against her by the remainderman, together with the court costs and expenses in connection with such suit; and has made full restitution to Walter T. Anderson, a co-trustee under the Gowen trust, for such money as he has paid to his attorney for legal services rendered in his defense in said accounting *272 suit, and all costs in connection therewith; and until he has paid the costs of this proceeding in the amount of $1574.25.
IT IS FURTHER ORDERED that the term of suspension hereby imposed shall commence December 1st, 1966.
It is so ordered.
THORNAL, C.J., and ROBERTS, DREW and O'CONNELL, JJ., concur.